## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

WELLS FARGO BANK, National Association,
Successor by Merger to First Security Bank, N.A., as
Indenture Trustee for SOUTHEASTERN NEW MEXICO
AFFORDABLE HOUSING CORPORATION MULTIFAMILY
HOUSING REVENUE REFUNDING BONDS (CASA
HERMOSA APARTMENTS) SERIES 1997A,

       Plaintiff,

vs.                                                                                     No. CIV 11-0182 JB/CG

SOUTHEASTERN NEW MEXICO AFFORDABLE
HOUSING CORPORATION and THE UNITED
STATES DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the United States' Motion to Dismiss, or in the

Alternative, for Summary Judgment, filed November 15, 2011 (Doc. 24)("Nov. 15, 2011 Motion").

The Court held a hearing on February 15, 2012.  The primary issues are: (i) whether Plaintiff Wells

Fargo Bank, National Association can maintain an action under 28 U.S.C. § 1346(a) against

Defendant United States Department of Housing and Urban Development ("HUD"); (ii) whether

the HUD has contractually waived sovereign immunity for the relief Wells Fargo seeks; (iii) whether

the twelve-year statute of limitations in 28 U.S.C. § 2409a bars any quiet title action Wells Fargo

has brought against the HUD; (iv) whether Wells Fargo can maintain this action against the HUD

under 28 U.S.C. § 2410; and (v) whether the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02,

permits Wells Fargo to bring its claims against the HUD.  Because 28 U.S.C. § 1346(a) does not

waive sovereign immunity against the United States[1] for suits for declaratory relief, there is no waiver of sovereign immunity for this suit that Wells Fargo has brought seeking declaratory relief against the HUD.   While the HUD has contractually consented to joinder in a foreclosure suit regarding the property in question, it has not contractually waived sovereign immunity for the relief Wells Fargo seeks.   Because the twelve-year statute of limitations under 28 U.S.C. § 2409a has run for Wells Fargo's quiet title action against the HUD, there is no waiver of sovereign immunity for suit under that statute.   Because the HUD does not hold a lien on the property in question, 28 U.S.C. § 2410 does not provide for a waiver of sovereign immunity for suit.   Because the Declaratory Judgment Act does not provide an independent basis for federal subject-matter jurisdiction or a waiver of sovereign immunity, it does not permit Wells Fargo to obtain the relief it seeks against the HUD.   The Court will grant the HUD's Nov. 15, 2011 Motion and dismiss all claims Wells Fargo has asserted against the HUD.   Because the HUD has consented to joinder to this foreclosure action, and does not oppose remaining a party to this action, the HUD will remain a party to the action while the foreclosure sale occurs.

## FACTUAL BACKGROUND

The facts in this case are largely undisputed.   Wells Fargo has not sought to dispute any of the facts the HUD has presented.   While the HUD both moves to dismiss the case under rule 12(b)(6) of the Federal Rules of Civil Procedure and for summary judgment under rule 56, the HUD has relied, to present the facts to the Court, almost exclusively on the allegations in Wells Fargo's pleadings as well as the attachments to Wells Fargo's pleadings.   The HUD has also moved for

---

[1]Throughout this Memorandum Opinion and Order, when the Court refers to a statutory waiver of sovereign immunity, the Court will refer to the United States as the one waiving sovereign immunity.  When the Court refers to contractual waivers of sovereign immunity, the Court will refer to the HUD as the one waiving sovereign immunity.

dismissal under rule 12(b)(1), which permits the Court to consider evidence outside the plaintiff's pleadings.  See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995).

In 1994, the HUD sold through a Special Warranty Deed (dated November 4, 1994), filed October 25, 2011 (Doc. 22-3), a multifamily housing project, located at 920 East Michigan Drive, Hobbs, New Mexico (the "Casa Hermosa property") for ten dollars to the Southeastern New Mexico Affordable Housing Corporation ("SNMAHC").  Nov. 15, 2011 Motion at 2 (setting forth this fact); Response in Opposition to Defendant United States Department of Housing and Urban Development's Second Motion to Dismiss, or in the Alternative, for Summary Judgment at 1-3, filed December 23, 2011 (Doc. 26)("Response to Nov. 15, 2011 Motion")(not disputing this fact).  On November 10, 1994, the Special Warranty Deed "was duly recorded and filed for record in Lea County, New Mexico at Deed Book 506, pages 233-242."  Nov. 15, 2011 Motion at 2 (setting forth this fact); Special Warranty Deed at 23-32; Response to Nov. 15, 2011 Motion at 1-3 (not disputing this fact).  "The Special Warranty Deed contains various deed restrictions giving HUD an equity position in all future refinancing or sales of the Property, and governing the operation and use of the Property by requiring maintenance of the land and its improvements be maintained for affordable housing for a specified amount of years."  Nov. 15, 2011 Motion at 2-3 (setting forth this fact). Accord Special Warranty Deed at 25-26, 28; Response to Nov. 15, 2011 Motion at 1-3 (not disputing this fact).  These deed restrictions "run with the land" according to the terms of the Special Warranty Deed: "The covenants set forth in this Deed shall run with the land hereby conveyed and, to the fullest extent permitted by law and equity, shall be binding for the benefit and in favor of and enforceable by Grantor and his successors in office."   Nov. 15, 2011 Motion at 3 (setting forth this fact); Special Warranty Deed at 23; Response to Nov. 15, 2011 Motion at 1-3 (not disputing this

-3-

fact).

The relevant provisions of Article IV in the Special Warranty Deed are as follows:

(1)    If the Grantee, its successors, assigns or purchasers for value, sells, assigns, transfers or conveys the Property (collectively a "Sale"), the Sale proceeds, less any expenses incurred by the Grantee as approved by the Grantor consisting of (1) reasonable transaction costs, (2) purchase price paid by the Grantee for the Property, (3) amounts previously paid by the Grantee to the Grantor under Paragraph (2) of this Rider since the previous sale of the Property, or (4) other costs paid by Grantee as approved by Grantor, i.e., costs of renovation and rehabilitation other than routine maintenance and repairs, shall be assigned to the Grantor in the following amount:

    (a)    For any sale which occurs between the date of the Deed and fifteen (15) years from the date of the Deed, one hundred percent (100%);

    (b)    For any sale which occurs between sixteen and twenty (16-20) years from the date of the Deed, seventy-five percent (75%);

    (c)    For any sale which occurs between twenty-one and thirty (21-30) years from the date of the Deed, fifty percent (50%); and

    (d)    For any sale which occurs over thirty (30) years from the date of the Deed, twenty-five percent (25%);

. . . . .

(4)    Grantee acknowledges that Grantee is financing the acquisition and renovation of the Real Property through Grantee's Issuance of certain multi-family housing revenue bond acquisition notes and bonds which are known as the Multi-Family Housing Revenue Bonds (Casa Hermosa Project Series 1994A) in the aggregate principal amount of $1.255 million ("Notes") and Grantee's Multi-Family Housing Revenue Bonds (Casa Hermosa Project Series 1994B), in an aggregate principal amount not to exceed $1.6 million ("Bonds").

In order to have such Notes and Bonds properly secured, Grantee must be able to grant a mortgage of first priority to secure payment of the Notes and the Bonds.  Accordingly, and notwithstanding anything contained herein to the contrary, the rights afforded to the United States Department of Housing and Urban Development as set forth in Section IV of this Special Warranty Deed shall be expressly subordinate to the terms of the mortgage granted to secure payment of such Notes and Bonds in the following particulars:

(a)     In the event Grantee defaults in any obligations undertaken by it pursuant to that certain Indenture dated October 5, 1994, between Southeastern New Mexico Affordable Housing Corporation and First Security Bank of New Mexico, N.A., as Trustee, the First Supplemental Indenture thereto dated October 5, 1994, and the Second Supplemental Indenture, the terms of the Notes or the Bonds, or the Mortgage on the Real Property pledged to secure payment of same, and in the further event as a result of such default, Mortgagor exercises its rights to foreclose the mortgage on the Real Property, then Grantor will not be entitled to participate in any equity in the property until such time as all costs of foreclosure and rehabilitation costs together with the mortgage debt secured by the Real Property and incurred in conjunction with the Issuance of the Multi-Family Housing Revenue Bonds Anticipation Notes (Casa Hermosa Project Series 1994A) and the Multi-Family Housing Revenue Bonds (Casa Hermosa Project Series 1994B) have been paid in full.

(b)     By executing this Special Warranty Deed, Grantor expressly consents to Grantee's granting of a mortgage to secure payment of the Bond Anticipation Notes and the Bonds hereinbefore referred to, and specifically stipulates and agrees that the issuance of such notes and bonds will not constitute a refinancing, nor will the Issuance of the bonds cause such transaction to fall within the provisions of Paragraph (VI2) of this Special Warranty Deed.

Special Warranty Deed at 25-26.  Article VIII in the Special Warranty Deed provides:

(1)     The Grantee covenants that Twenty (20) units in the Property shall be maintained as housing for low- and moderate-income persons or families, which shall be defined as follows:

Families, elderly, or handicapped individuals with adjusted annual gross income at or below eighty (80) percent of the median income for the area.

(2)     This covenant shall continue in effect for a period of fifteen (15) years from the date of this Deed, or such earlier time as the Grantor may specify in writing.  During such period if the number of units occupied by low- and moderate-income persons or families falls below the number of units specified in Paragraph (1) above, the Grantee must seek to rent a sufficient number of units to low- and moderate-income persons or families to comply with Paragraph (1).

Special Warranty Deed at 28.  Article IX in the Special Warranty Deed provides:

-5-

(1)     The Grantee covenants that the rents for sixty-eight (68) units in the Property shall remain affordable for moderate-incoming persons or families, which shall be defined as follows:

> Families, elderly, or handicapped individuals with adjusted annual gross income at or below eighty percent (60%) of the median income for the area.

(2)     This covenant shall continue in effect for a period of thirty (30) years from the date of this Deed, or such earlier time as the Grantor may specify in writing.  During such period if the number of units occupied by moderate-income persons or families falls below the number of units specified in Paragraph (1) above, the Grantee must seek to rent a sufficient number of units to moderate-income persons or families to comply with Paragraph (1).

Special Warranty Deed at 28.

In 1997, the HUD executed a Consent to Refinance and Subordination Agreement (dated December 11, 1997), filed October 25, 2011 (Doc. 22-3)("Subordination Agreement"), that approved the refinancing of the property at the SNMAHC's request to "redeem certain bonds which were outstanding and payment of which is secured, in party, by the Real Property and to issue refunding bonds in order to achieve such financing."  Nov. 15, 2011 Motion at 3 (setting forth this fact).  Accord Subordination Agreement at 33; Response to Nov. 15, 2011 Motion at 1-3 (not disputing this fact).  The parties to the Special Warranty Deed accomplished the 1997 refinancing "by issuance by [the SNMAHC] of One Million Eight Hundred Thirty Thousand Dollard ($1,830,000.00) worth of Multifamily Housing Revenue Refunding Bonds (Casa Hermosa Apartments) Series 1997A."  Nov. 15, 2011 Motion at 3 (setting forth this fact).  Accord Subordination Agreement at 34; Response to Nov. 15, 2011 Motion at 1-3 (not disputing this fact). "Articles VIII and IX of the Special Warranty Deed are made not applicable by the Subordination Agreement to any foreclosure of the mortgage securing the Series 1997A bonds."  Nov. 15, 2011 Motion at 3 (setting forth this fact).  Accord Subordination Agreement at 34; Response to Nov. 15,

2011 Motion at 1-3 (not disputing this fact).  More specifically, the Subordination Agreement provides:

> **WHEREAS**, the holders of the Refunding Bonds secured by the Mortgage on the Real Property wish to assure themselves that in the event of a default under the terms of the Bonds, the Indenture by which such bonds are issued, or the Mortgage securing payment of the bonds, and in the event of foreclosure of the Mortgage, that the restrictions set out in Articles VIII and IX of the Special Warranty Deed will not be applicable to any new owner acquiring the Real Property as the result of such default and foreclosure; and
>
> **WHEREAS**, HUD is willing to waive the restrictions set out in Articles VIII and IX in the event of such default and foreclosure, provided that the new owner is not a subsidiary or affiliate of Grantee . . . .

Subordination Agreement at 34 (emphasis in original).

"Without reference to Article IV, governing HUD's equity participation, the Subordination Agreement does not subordinate to any foreclosure of the mortgage securing the issuance of the Series 1997A."  Nov. 15, 2011 Motion at 3 (setting forth this fact); Response to Nov. 15, 2011 Motion at 1-3 (not disputing this fact).  The Subordination Agreement mentions Article IV from the Special Warranty Deed, but does not otherwise modify the applicability of this provision in the event of foreclosure.  See Subordination Agreement at 33 (mentioning that the "Special Warranty Deed included a number of restrictions, including those found in the Special Warranty Deed under Article IV which is entitled 'Equity Participation'").  The Subordination Agreement states: "In all other particulars, the restrictions and terms of the Special Warranty Deed are hereby ratified and confirmed."  Nov. 15, 2011 Motion at 3 (setting forth this fact).  Accord Subordination Agreement at 35; Response to Nov. 15, 2011 Motion at 1-3 (not disputing this fact).  The Subordination Agreement "was filed of record in Lea County, New Mexico, in Book 843, page 251 on December 17, 1997."  Nov. 15, 2011 Motion at 3 (setting forth this fact).  Accord Subordination Agreement at 37; Amended Complaint for Foreclosure and Damages ¶¶ 35, 37, at 6-7, filed October 25, 2012

(Doc. 22)("Amended Complaint"); Response to Nov. 15, 2011 Motion at 1-3 (not disputing this fact).

Because of the SNMAHC's default on the debt, Wells Fargo seeks declaratory and injunctive relief, asking the Court to hold that:

> Plaintiff's liens have first priority against the Property and are senior to any of HUD's claims; that any proceeds from any sale of the Property "be declared prior and paramount to" HUD's interest; that a purchaser at sale to take property free and clear of any of HUD's interests; and that any interest HUD would have in effecting the sale of the Property would be foreclosed.

Nov. 15, 2011 Motion at 3-4 (setting forth this fact). Accord Amended Complaint ¶¶ D-J, at 11-12; Response to Nov. 15, 2011 Motion at 1-3 (not disputing this fact). "Plaintiff alternatively pleads that Plaintiff should be allowed to foreclose on the property subject to HUD's interest." Nov. 15, 2011 Motion at 3-4 (setting forth this fact). Accord Response to Nov. 15, 2011 Motion at 1-3 (not disputing this fact).

## PROCEDURAL BACKGROUND

On November 24, 2010, Wells Fargo filed its Complaint for Foreclosure and Damages in the Fifth Judicial District Court, County of Lea, State of New Mexico. See Complaint for Foreclosure and Damages, filed February 24, 2011 (Doc. 1-2)("Complaint").[2] The Defendants, the HUD and the SNMAHC, removed this case to federal court on February 24, 2011. See Notice of Removal at 1 (Doc. 1).

On March 24, 2011, the HUD filed its United States' Motion to Dismiss, or in the Alternative, for Summary Judgment. See Doc. 5 ("Mar. 24, 2011 Motion"). The HUD moved for

---

[2]It is not clear from the Complaint on which day Wells Fargo filed this lawsuit, given that there is no filestamp on the document, but the New Mexico state court docket indicates that it filed this lawsuit on November 24, 2010. See Wells Fargo Bank v. Southeastern New Mexico Affordable Housing Corp., No. D-506-CV-201001263, available at http://www2.nmcourts.gov/caselookup/app.

dismissal under rule 12(b)(1) of the Federal Rules of Civil Procedure or, alternatively for summary judgment, on the basis that the Court lacks subject-matter jurisdiction to hear this case, because the United States has not waived sovereign immunity for the claims Wells Fargo seeks to assert.  See Mar. 24, 2011 Motion at 1.  Alternatively, the HUD moved for dismissal under rule 12(b)(6) for failure to state a claim.  See Mar. 24, 2011 Motion at 7-8.  The HUD asserted that 28 U.S.C. § 2410 does not support a waiver of sovereign immunity, because the "HUD's deed restrictions constitute neither a mortgage nor lien under the statute and thus HUD has not waived sovereign immunity under the statute."  Mar. 24, 2011 Motion at 10-11.  The HUD also argued that Wells Fargo lacks standing to assert its claims, because Wells Fargo "does not allege HUD's deed restrictions result in a 'personal injury' that is 'fairly traceable' to 'allegedly unlawful conduct' of HUD."  Mar. 24, 2011 Motion at 11-12.  The HUD further asserted that Wells Fargo cannot show that the remedy Wells Fargo seeks against the HUD will redress Wells Fargo's injuries.  See Mar. 24, 2011 Motion at 12.  The HUD contended that, if Wells Fargo seeks damages, it has not established that there is a waiver of sovereign immunity under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80 ("FTCA").  See Mar. 24, 2011 Motion at 12 n.2.  The HUD argued that dismissal under rule 12(b)(6) is appropriate, because Wells Fargo "erroneously attempts to overreach the applicability of Article IV provisions of the 1994 Special Warranty Deed beyond HUD's approval of SNMAHC's 1997 refinancing and mortgage and by confusing the 1994 and 1997 transactions."  Mar. 24, 2011 Motion at 13.  The HUD asserted that, "[e]xcept by implication, Plaintiff makes no specific allegation in the Complaint that HUD relinquished its Article IV equity participation rights of the Special Warranty Deed beyond its approval of the 1997 refinancing."  Mar. 24, 2011 Motion at 13.  The HUD argued that its restrictive covenants run with the land at issue.  See Mar. 24, 2011 Motion at 13.

On April 25, 2011, Wells Fargo filed its Response in Opposition to Defendant United States

Department of Housing and Urban Development's Motion to Dismiss, or in the Alternative, for Summary Judgment.  See Doc. 9 ("Response to Mar. 24, 2011 Motion").  Wells Fargo acknowledged that it has the burden to "show that this Court has subject matter jurisdiction over this dispute."  Response to Mar. 24, 2011 Motion at 2.  Wells Fargo represented that, "[b]ecause this action was filed in New Mexico state court, the Complaint did not expressly provide the basis for federal jurisdiction."  Response to Mar. 24, 2011 Motion at 2.  Wells Fargo noted that it is "unclear whether HUD is arguing that this cause should be remanded back to the Fifth Judicial District for the State of New Mexico or that there is no forum in which" it "can proceed against HUD." Response to Mar. 24, 2011 Motion at 2.  Wells Fargo contended that the Court has subject-matter jurisdiction under "28 U.S.C. § 2201 or 28 U.S.C. § 2409a" to render "a judicial declaration . . . holding that the foreclosure sale (so long as the purchaser is unrelated to the Issuer) is not subject to Article IV of the Special Warranty Deed."   Response to Mar. 24, 2011 Motion at 3.  Wells Fargo also asserted that the "HUD has waived any sovereign immunity by virtue of 28 U.S.C. §§ 2409a and 2410 and the Consent to Refinance and Subordination Agreement."  Response to Mar. 24, 2011 Motion at 3.  Wells Fargo argued that "an actual case or controversy exists" regarding "the applicability of Article IV of the Special Warranty deed" given that "[t]he parties have been unable to resolve this matter by themselves" and have subsequently entered into litigation, because "there can be no foreclosure in New Mexico except through a judicial decree."  Response to Mar. 24, 2011 Motion at 4.  Wells Fargo asserted that it seeks "a court order declaring that the restriction dealt with in the Subordination Agreement, along with the restrictions under Article IV, are not applicable to any purchaser at the foreclosure sale, so long as the purchaser is unrelated to the Issuer."  Response to Mar. 24, 2011 Motion at 4.

Wells Fargo noted that a federal court "has the authority under 28 U.S.C. § 2201" to issue

declaratory relief.  Response to Mar. 24, 2011 Motion at 5.  Wells Fargo noted that 28 U.S.C. § 1346(a)(2) provides for jurisdiction over cases where the United States is a defendant.  See Response to Mar. 24, 2011 Motion at 5-6.  Wells Fargo also related that 28 U.S.C. § 1346(f) provides federal courts with "exclusive original jurisdiction of civil action [sic] under section 2409a."  Response to Mar. 24, 2011 Motion at 6.  Wells Fargo contended that 28 U.S.C. § 1441(f) permits removal of a case even if "the State court from which such civil action is removed did not have jurisdiction over that claim."  Response to Mar. 24, 2011 Motion at 7 (quoting 28 U.S.C. § 1441(f)).  Wells Fargo argued that 28 U.S.C. § 1444 permits removal of "[a]ny action brought under" 28 U.S.C. § 2410 "against the United States."  Response to Mar. 24, 2011 Motion at 8 (quoting 28 U.S.C. § 1444).  Wells Fargo asserted that, "[b]y entering into this [subordination] agreement, HUD expressly submitted itself to the legal enforcement of the terms of the agreement, thereby waiving sovereign immunity."  Response to Mar. 24, 2011 Motion at 9.  Wells Fargo contended that subject-matter jurisdiction is available under 28 U.S.C. § 2409a, because that statute "expressly waives sovereign immunity for the United States when there is a clouded title."  Response to Mar. 24, 2011 Motion at 10.  Wells Fargo asserted that subject-matter jurisdiction is also available under 28 U.S.C. § 2410, because that statute "expressly waives sovereign immunity for the United States when the United States has or claims a mortgage or other lien against the property."  Response to Mar. 24, 2011 Motion at 10.  Wells Fargo asserted that the HUD incorrectly argued that "Article IV is a restriction in the Special Warranty Deed and not a lien."  Response to Mar. 24, 2011 Motion at 10-11.

On May 3, 2011, the HUD filed its United States' Reply to Response in Opposition to Defendant United States Department of Housing and Urban Development's Motion to Dismiss, or in the Alternative, for Summary Judgment.  See Doc. 10 ("Reply to Response to Mar. 24, 2011

-11-

Motion"). The HUD noted that "[t]he Response clarifies that only declaratory relief, not monetary damages, is sought against HUD." Reply to Response to Mar. 24, 2011 Motion at 2. The HUD asserted that Wells Fargo, "not a party to either contract, fails to reveal its contractual theory upon which it bases its claim against HUD or justify it when" 28 U.S.C. § 1346(a)(2) "does not grant jurisdiction to suit [sic] other than for money damages." Reply to Response to Mar. 24, 2011 Motion at 3. The HUD contended that 28 U.S.C. § 1346(f) "likewise fails" as a basis for jurisdiction, "because there is no title dispute to the property upon which plaintiff seeks foreclosure" given that "[n]either HUD nor plaintiff claim any estate, fee simple or less, and only if such an ownership interest is disputed by 'right, title, or interest . . . in the real property' does jurisdiction under Section 1346(f) exist for an action under 28 U.S.C. § 2409a." Reply to Response to Mar. 24, 2011 Motion at 3 (quoting McKay v. United States, 516 F.3d 848, 850 (10th Cir. 2008)). The HUD asserted that disputes regarding liens that the United States holds are "specifically excluded in Section 2409a." Reply to Response to Mar. 24, 2011 Motion at 3. The HUD also argued, "[m]ost importantly, [that] over 15 years has elapsed since the execution and filing of record of the 1994 Special Warranty Deed and 1997 Subordination Agreement" such that the statute of limitations for filing an action under 28 U.S.C. § 2409a has run. Reply to Response to Mar. 24, 2011 Motion at 4. The HUD emphasized that it has not "waived its sovereign immunity pursuant to" 28 U.S.C. § 2410, because the "HUD does not claim a mortgage or other lien" to the property as required for jurisdiction under 28 U.S.C. § 2410. Reply to Response to Mar. 24, 2011 Motion at 5.

The Court held a hearing on July 19, 2011. See Clerk's Minutes at 1, filed July 19, 2011 (Doc. 19). After the parties argued the Mar. 24, 2011 Motion, they acknowledged that a more appropriate course of action than having the Court decide the Mar. 24, 2011 Motion would be for Wells Fargo to file an amended complaint to try to address some of the United States' concerns. See

Transcript of Hearing at 18:9-20:25 (taken July 19, 2011)(Court, Vadnais, Lucero)("July 19, 2011 Tr.").[3]   The HUD acknowledged that there may be some relief available to Wells Fargo but maintained that Wells Fargo could not seek the relief it requested based on the current state of the Complaint.  See July 19, 2011 Tr. at 9:12-10:9 (Lucero).  Given that Wells Fargo filed the case in state court, and now was before a federal court, the Court acknowledged that the Complaint would not address federal jurisdiction at all and agreed that it made sense for Wells Fargo to try and file a pleading that was more suited for federal court.  See July 19, 2011 Tr. at 18:9-19:5, 21:1-11, 22:3-18 (Court).

On October 25, 2011, Wells Fargo filed its Amended Complaint for Foreclosure and Damages.  See Doc. 22 ("Amended Complaint").  In its Amended Complaint, Wells Fargo asserts the following bases for the Court's jurisdiction to hear this case: (i) 28 U.S.C. § 1346(a)(2); (ii) 28 U.S.C. § 1346(f); (iii) 28 U.S.C. § 2201; and (iv) 28 U.S.C. § 2209a.  Amended Complaint ¶ 9, at 2.  Wells Fargo asserts that it is the "Successor in Interest to First Security Bank, N.A. as Indenture Trustee for holders of certain Southeastern New Mexico Affordable Housing Corporation Multifamily Housing Revenue Refunding Bonds (Casa Hermosa Apartment) Series 1997A." Amended Complaint at 1.  Wells Fargo alleges that the SNMAHC has defaulted on its loan obligations regarding the property at issue.  See Amended Complaint ¶ 43, at 8.  Wells Fargo seeks to "accelerate the amounts due" to it, and to have the Court "judicially foreclose its liens on the Property and the Chattels, and to terminate any interest asserted by HUD in the Property or its right to participate in the distribution of any funds from the sale of the Property unless Plaintiff is paid in full."  Amended Complaint ¶ 49, at 9.  Wells Fargo requests that the "restrictions imposed in the

---

[3]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

Special Warranty Deed Articles VIII and IX . . . be declared to be inapplicable by the passage of time, with respect to the former, and declared to be inapplicable to any subsequent sale of the Property."  Amended Complaint ¶ 53, at 10.  Wells Fargo contends that "the purchaser at any foreclosure sale should take title free and clear of any restrictions imposed by Article VIII or IX of the Special Warranty Deed from HUD to Issuer."  Amended Complaint ¶ 53, at 10.  Wells Fargo asserts that the "equity participation reservation in the Special Warranty Deed in Article IV should be declared inapplicable to" both: (i) "a foreclosure sale of the Property"; and (ii) "any sale of the Property by the purchaser of the Property at the foreclosure sale, unless said purchaser is Issuer, or a successor or assign of Issuer, or a purchaser of Issuer."  Amended Complaint ¶¶ 54-55, at 10.  Wells Fargo requests that the Court "appoint a Special Master to conduct the foreclosure sale or sales."  Amended Complaint ¶ 59, at 11.

On November 15, 2011, the HUD filed its Notice of the Withdrawal of United States Housing and Urban Development's Opposed Motion to Dismiss (Doc. No. 5).  See Doc. 23.  On November 15, 2011, the HUD filed its Nov. 15, 2011 Motion.  See Doc. 24.  The HUD asserts that Wells Fargo cannot establish that the Court has subject-matter jurisdiction under 28 U.S.C. § 1346(a)(2), because that statute "empowers district courts to award damages but not to grant injunctive or declaratory relief."  Nov. 15, 2011 Motion at 7-8 (emphasis in original)(quoting Lee v. Thornton, 420 U.S. 139, 140 (1975)(per curiam)).  The HUD notes that the Court has jurisdiction to issue a declaratory judgment under 28 U.S.C. § 2201(a) only "when other grounds for jurisdiction are present" given that this statute does not contain an independent grant of subject-matter jurisdiction or independent waiver of sovereign immunity.  Nov. 15, 2011 Motion at 8.  The HUD argues that the United States has not waived sovereign immunity, because Wells Fargo has not brought its quiet title action within the twelve-year statute of limitations, which the HUD asserts

-14-

serves as a jurisdictional bar.  See Nov. 15, 2011 Motion at 8-9.  The HUD contends that Wells

Fargo lacks standing to bring this lawsuit, because it has not suffered any injury that the HUD's

conduct caused.  See Nov. 15, 2011 Motion at 10.  The HUD asserts that "[t]here is no factual,

facial, or legal connection in support of Plaintiff's claims between Article IV of the 1994 Warranty

Deed and the 1997 refinancing mortgage and the Subordinate Agreement."  Nov. 15, 2011 Motion

at 10.  The HUD clarifies that

> if Plaintiff's alternative position simply is that it seeks the ability to foreclose on the
> property, and concedes that its interest in the property is subordinate to HUD's
> interest, including Article IV of the Special Warranty Deed, then there is no case or
> controversy regarding Plaintiff's alternative pleading and it is not contested.

Nov. 15, 2011 Motion at 11.

Alternatively, the HUD argues that the Court should dismiss the Amended Complaint under

rule 12(b)(6).  It asserts that: (i) "Plaintiff's quiet title claims are untimely"; and (ii) "Plaintiff

erroneously appears to apply Article IV provision of the 1994 Special Warranty Deed to its 1997

refinancing and mortgage by confusing the 1994 and 1997 transactions."  Nov. 15, 2011 Motion at

11.  The HUD notes that "[t]ermination or amendment of a restrictive covenant by release or

agreement is based on contract law, as one entitled to enforce a promise may relieve the promisor

of the obligation," and emphasizes that "[t]here is, however, no specific allegation in the Amended

Complaint that HUD relinquished its equity participation rights in Article IV of the Special

Warranty Deed and a reading of the Subordination Agreement does not support such a conclusion."

Nov. 15, 2011 Motion at 11.  The HUD asserts that "[t]he 1994 Special Warranty Deed, relating to

the 1994 HUD sale to SNMAHC, imposes restrictions that run with the land until terminated."  Nov.

15, 2011 Motion at 12.  The HUD elaborates that its

> agreement in Article IV of the Special Warranty Deed to not participate in any equity
> resulting from a foreclosure relates only to the 1994 financing and is not applicable

-15-

to the 1997 refinancing with a new mortgage and a new Series 1997A bonds, the subject of the 1997 Subordination Agreement and this lawsuit.

Nov. 15, 2011 Motion at 12-13. The HUD argues that "[a]ny foreclosure by Plaintiff should not be 'free and clear' of HUD's deed restrictions, as plead [sic], because HUD's interest runs with the land and is enforceable in law and equity." Nov. 15, 2011 Motion at 13. The HUD relates that Wells Fargo's "alternative argument that foreclosure should be subject to HUD's interest is not contested because HUD's interest primes Plaintiff's interest in that deed restrictions are not subject to foreclosure." Nov. 15, 2011 Motion at 13-14. The HUD contends that its interest in the property is not a lien, but rather a restrictive covenant. See Nov. 15, 2011 Motion at 14. It further argues that, even if its "interest constituted a lien interest, HUD's 1994 interest would prime Plaintiff's 1997 interest because it is first in time." Nov. 15, 2011 Motion at 14.

On December 23, 2011, Wells Fargo filed its Response to Nov. 15, 2011 Motion. See Doc. 26. Wells Fargo argues that the Court "has jurisdiction under 28 U.S.C. §§ 1346(a)(2), 1346(f), 2201(a), and 2409a." Response to Nov. 15, 2011 Motion at 2. It contends that "the quiet title claim against HUD is not time barred because Plaintiff did not have any claim or interest adverse to HUD until the Borrower defaulted in its performance, which occurred in June, 2010." Response to Nov. 15, 2011 Motion at 1. Wells Fargo "does not dispute that the restrictions of the Special Warranty Deed run with the land." Response to Nov. 15, 2011 Motion at 7. It contends that the restrictions in Article IV "are, by their own terms, only applicable to SNMAHC, its successors, assigns, or purchasers for value from SNMAHC." Response to Nov. 15, 2011 Motion at 7. Wells Fargo states: "To the extent Plaintiff has sought a declaration that the purchaser take the property free and clear of any claims by HUD, that request was in error as the deed restrictions plainly run with the land, and affect purchasers from, or affiliates of, SNMAHC." Response to Nov. 15, 2011 Motion at 8.

-16-

Wells Fargo elaborates that it "does seek a decree from this Court that Article IV is only applicable to voluntary sales by SNMAHC, or its affiliates, and is made clear by the Special Warranty Deed." Response to Nov. 15, 2011 Motion at 8.  Wells Fargo contends that the restrictions Article IV imposes constitute a lien that the HUD holds, which foreclosure will extinguish.  See Response to Nov. 15, 2011 Motion at 8-9.

On January 20, 2012, the HUD filed its United States' Reply to Response in Opposition to Defendant United States Department of Housing and Urban Development's Second Motion to Dismiss, or in the Alternative, for Summary Judgment.  See Doc. 27 ("Reply to Response to Nov. 15, 2011 Motion").  The HUD asserts that 28 U.S.C. § 1346(a)(2) does not "confer subject matter jurisdiction on [Wells Fargo's] claims against HUD," because Wells Fargo is "not a party to either contract" that is the subject of this suit and "fails to reveal its contractual theory upon which it bases it claims against HUD or justify it when" 28 U.S.C. § 1346(a)(2) "does not grant jurisdiction to suits other than for money damages."  Reply to Response to Nov. 15, 2011 Motion at 3.  The HUD asserts that "Plaintiff's jurisdictional claim pursuant to 28 U.S.C. § 1346(f) likewise fails because there is no title dispute to the property upon which plaintiff seeks foreclosure" given that "[n]either HUD nor plaintiff claim any estate, fee simple or less" in the property at issue.  Reply to Response to Nov. 15, 2011 Motion at 3.  The HUD argues that 28 U.S.C. § 2410 does not establish a waiver of sovereign immunity, because the "HUD's equity participation under Article IV is not security for repayment of a debt because there is none between HUD and SNMAHC."  Reply to Response to Nov. 15, 2011 Motion at 5.

At the hearing on February 15, 2012, the HUD clarified that it does not oppose the foreclosure that Wells Fargo seeks but that it opposes some of the additional declaratory relief that Wells Fargo seeks.  See Transcript of Hearing at 5:11-6:1 (taken February 15, 2011)(Court,

Lucero)("Feb. 15, 2012 Tr."). The HUD characterized its interest as an easement that runs with the property rather than a lien. See Feb. 15, 2012 Tr. at 7:9-8:3 (Lucero). The Court asked the HUD if, given that the HUD is asserting that the present suit is not a proper one in which to raise the issues Wells Fargo seeks to litigate against it, the issues Wells Fargo seeks to litigate would instead arise properly in a suit the HUD brings against Wells Fargo for failure to comply with its obligations regarding the property. See Feb. 15, 2012 Tr. at 9:6-14 (Court). The HUD agreed that such a lawsuit would be the likely result if the Court holds that it does not have jurisdiction over this suit. See Feb. 15, 2012 Tr. at 9:15-16 (Lucero). Wells Fargo noted that the deed requires that, if it elects to foreclose on the property, it must name the HUD as a party to the lawsuit. See Feb. 15, 2012 Tr. at 12:13-20 (Vadnais). Wells Fargo asserted that, even if the Court dismisses the claim against the HUD, the foreclosure action against the SNMAHC will remain. See Feb. 15, 2012 Tr. at 17:10-17 (Vadnais). Wells Fargo stated that, pursuant to Article IX in the deed documents, the HUD should still remain a party to this action even if the Court dismisses Wells Fargo's claims against the HUD. See Feb. 15, 2012 Tr. at 17:16-20 (Vadnais). The HUD asserted that 28 U.S.C. § 2410 does not contain a waiver of sovereign immunity. See Feb. 15, 2012 Tr. at 24:7-21 (Lucero).

## LEGAL STANDARD FOR MOTIONS TO DISMISS UNDER RULE 12(b)(1)

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress." Henry v. Office of Thrift Supervision, 43 F.3d 507, 511 (10th Cir. 1994)(citations omitted). A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its existence."). Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to raise the defense of the

court's "lack of jurisdiction over the subject matter" by motion.  Fed. R. Civ. P.12(b)(1).  The

United States Court of Appeals for the Tenth Circuit has held that motions to dismiss for lack of

subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency

of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts

upon which subject-matter jurisdiction is based."  Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th

Cir. 2002).

> On a facial attack, a plaintiff is afforded safeguards similar to those provided in
> opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations
> to be true.  See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v. Tucker, 645
> F.2d 404, 412 (5th Cir. 1981).  But when the attack is aimed at the jurisdictional facts
> themselves, a district court may not presume the truthfulness of those allegations.
> A court has wide discretion to allow affidavits, other documents, and a limited
> evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).  In
> such instances, a court's reference to evidence outside the pleadings does not convert
> the motion to a Rule 56 [summary-judgment] motion.

Hill v. Vanderbilt Capital Advisors, LLC, No. 10-0133, 2011 WL 6013025, at *8 (D.N.M. Sept. 30,

2011)(Browning, J.).  As the United States Court of Appeals for the Fifth Circuit has stated:

> [T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56.
> Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very
> power to hear the case -- there is substantial authority that the trial court is free to
> weigh the evidence and satisfy itself as to the existence of its power to hear the case.
> In short, no presumptive truthfulness attaches to plaintiff's allegations, and the
> existence of disputed material facts will not preclude the trial court from evaluating
> for itself the merits of jurisdictional claims.

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortensen v. First Fed. Sav.

& Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

    When making a rule 12(b)(1) motion, a party may go beyond the allegations in the complaint

to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or

other evidence properly before the court.  See New Mexicans for Bill Richardson v. Gonzales, 64

F.3d at 1499; Holt v. United States, 46 F.3d 1000, 1003 (10thCir.1995).  In those instances, a court's

reference to evidence outside the pleadings does not necessarily convert the motion to a rule 56 motion for summary judgment.  See Holt v. United States, 46 F.3d at 1003 (citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)).  Where, however, a court determines that jurisdictional issues raised in rule 12(b)(1) motion are intertwined with the case's merits, the court should resolve the motion under either rule 12(b)(6) or rule 56.  See Franklin Sav. Corp. v. United States, 180 F.3d 1124, 1129 (10th Cir. 1999); Tippet v. United States, 108 F.3d 1194, 1196 (10th Cir. 1997).  "When deciding whether jurisdiction is intertwined with the merits of a particular dispute, 'the underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim.'"  Davis ex rel. Davis v. United States, 343 F.3d 1282, 1296 (10th Cir. 2003)(quoting Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324 (10th Cir. 2002)).

## STANDARD FOR A MOTION TO DISMISS UNDER RULE 12(b)(6)

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of Ponca, 952 F.2d 1183, 1187 (10th Cir. 1991).

A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual

allegations, but a plaintiff's burden to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 546 (2007).  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(stating that a plaintiff's complaint must set forth more than a threadbare recital "of the elements of a cause of action, supported by mere conclusory statements").  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550 U.S. at 545 (citation omitted).  To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678.  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007).  The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted).

## LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing

party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three

principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Third, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## LAW REGARDING SOVEREIGN IMMUNITY

"The United States cannot be sued without its consent."  Garcia v. United States, 709 F.Supp.2d 1133, 1137 (D.N.M. 2010)(Browning, J.).  "Congressional consent -- a waiver of the traditional principle of sovereign immunity -- is a prerequisite for federal-court jurisdiction." Garcia v. United States, 709 F.Supp.2d at 1137-38.  "The plaintiff bears the burden of proving that Congress has waived sovereign immunity for all of his claims."  Garcia v. United States, 709 F.Supp.2d at 1138.  Accord Bork v. Carroll, 449 F.App'x 719, 721 (10th Cir. 2011)(unpublished)("So it is that a plaintiff seeking to invoke the jurisdiction of the federal courts bears the burden of identifying an applicable statutory waiver of sovereign immunity when challenged to do so."); Summa v. United States, 936 F.2d 584, 1991 WL 114638, at *3 (10th Cir. 1991)(unpublished table decision)(holding in an FTCA case that the "Plaintiffs bore the burden of proving that the district court had subject matter jurisdiction over their claims" (citing Miller v. United States, 710 F.2d 656, 662 (10th Cir. 1983)).

1.      **General Principles of Sovereign Immunity.**

It is "axiomatic that the United States may not be sued without its consent and that the

existence of consent is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. 206, 212 (1983)(citations omitted).  Accord FDIC v. Meyer, 510 U.S. 471, 475 (1994): United States v. Testan, 424 U.S. 392, 399 (1976); United States v. Sherwood, 312 U.S. 584, 586 (1941).  As with any jurisdictional issue, the party bringing suit against the United States bears the burden of proving that sovereign immunity has been waived.  See James v. United States, 970 F.2d 750, 753 (10th Cir. 1992).  A waiver of sovereign immunity cannot be implied and must be unequivocally expressed. See United States v. Nordic Vill., Inc., 503 U.S. 30, 33-34 (1992); United States v. Mitchell, 445 U.S. 535, 538 (1980); United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 (10th Cir. 1996).  The United States' agencies also have sovereign immunity absent a waiver.  See FDIC v. Meyer, 510 U.S. 471, 475 (1994)("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit").

> **2.     28 U.S.C. § 1346(a)(2).**

28 U.S.C. § 1346(a)(2) provides:

> (a)     The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:
>
> . . .
>
> (2)     Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort, except that the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort which are subject to sections 7104(b)(1) and 7107(a)(1) of title 41.

28 U.S.C. § 1346(a)(2).  The Supreme Court of the United States has held that this statute "empowers district courts to award damages but not to grant injunctive or declaratory relief."  Lee

v. Thornton, 420 U.S. at 140.  The Tenth Circuit found the exercise of jurisdiction under this statute improper when the plaintiff "sought the equitable relief of rescission, while employing language designed to render the federal defendants liable in damages in the amount of the promissory note." Ortiz v. United States, 661 F.2d 826, 830-31 (10th Cir. 1981).  Accord McKay v. United States, 516 F.3d 848, 851 (10th Cir. 2008)("But this action involves a contractual, not a constitutional, obligation and plaintiff does not cite, nor have we found, any contract case holding that [28 U.S.C. § 1346(a)(2)] may be avoided . . . by forgoing the damages remedy the Act permits and seeking equitable relief it prohibits.").  "A plaintiff attempting to invoke the subject matter of the federal district courts bears the burden to establish his or her claim does not exceed the $10,000.00 jurisdictional limit established by" 28 U.S.C. § 1346(f).  Cortez v. EEOC, 585 F.Supp.2d 1273, 1288 (D.N.M. 2007)(Browning, J.).

      **3.**      **28 U.S.C. §§ 1346(f) and 2409a.**

28 U.S.C. § 1346(f) provides: "The district courts shall have exclusive original jurisdiction of civil actions under section 2409a to quiet title to an estate or interest in real property in which an interest is claimed by the United States."  28 U.S.C. § 1346(f).  28 U.S.C. § 2409a provides in relevant part: "The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights."  28 U.S.C. § 2409a(a).  These statutes, often referred to as the Quiet Title Act, 28 U.S.C. §§ 1346(f), 2409a ("QTA"), together provide subject-matter jurisdiction and a waiver of sovereign immunity for quiet title actions against the United States.  See Match-E-Ba-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, Nos. 11-246 and 11-247, 2012 WL 2202936, at *5 (U.S. June 18, 2012)("From its title to its jurisdictional grant to its venue provision, the Act speaks specifically and repeatedly of 'quiet title' actions.  That term is universally

understood to refer to suits in which a plaintiff not only challenges someone else's claim, but also asserts his own right to disputed property." (citations omitted)).  "Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property."  United States v. Mottaz, 476 U.S. 834, 841 (1986).  The Tenth Circuit has stated that, "as its legislative history makes clear, the QTA applies even where the plaintiff claims an estate less than a fee simple . . . [such as] an easement."  McKay v. United States, 516 F.3d at 850 (alteration in original)(internal quotation marks omitted).

28 U.S.C. § 2409a(g) provides:

> Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued.  Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. § 2409a(g).  As the Supreme Court has stated: "The limitations period is a central condition of the consent given by the Act."  United States v. Mottaz, 476 U.S. at 843.  A plaintiff's claim being timely under this statute of limitations is a jurisdictional prerequisite to suit under 28 U.S.C. § 2409a.  See Block v. North Dakota ex rel. Bd. of Univ and Sch. Lands, 461 U.S. 273, 287 (1983)("When waiver legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity."); Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d 1165, 1175 (10th Cir. 2010)("Timeliness under subsection [(g)] is a jurisdictional prerequisite to suit under section 2409a." (alteration in original)).

"The twelve-year limitations period is strictly construed in favor of the United States."  Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d at 1176.  The

Tenth Circuit has "held that for purposes of determining when 'the claim' accrues under § 2409a(f),[4] '[a]ll that is necessary is a reasonable awareness that the government claims some interest adverse to the plaintiffs.'"  Vincent Murphy Chevrolet Co., Inc. v. United States, 766 F.2d 449, 452 (10th Cir. 1985).  "Knowledge of the claim's full contours is not required.  All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's."  Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d at 1176 (emphasis in original).  "[T]he United States need not assert a full legal title in the disputed property for the limitations period to accrue; the claimed adverse interest in the title of the property merely must be substantial enough to create a cloud on title."  Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d at 1176.  The Tenth Circuit has held that the knowledge of deed restrictions in place that benefitted the United States was sufficient to trigger the running of the statute of limitations under 28 U.S.C. § 2409a(f).  See Vincent Murphy Chevrolet Co., Inc. v. United States, 766 F.2d at 452 ("Appellants concede knowledge of a 'claim' -- the deed restrictions -- as early as 1965.  This is all that is necessary under § 2409a(f).").  The Tenth Circuit elaborated:

> While the Supreme Court in Block indicated that the statutes waiving immunity should not be construed in an unduly restrictive manner, it cautioned that these statutes could not be interpreted in such a manner as to "'extend the waiver beyond that which Congress intended.'"
>
> To hold that the twelve-year statute of limitations did not begin to run until conditions began changing would give rise to an interpretation of the term "claim" under § 2409a(f) which could extend the limitations period indefinitely.  We cannot extend the waiver of immunity under the quiet title act beyond that which Congress could have intended and we refuse to do so without a clear expression of legislative intent.

---

[4]An older version of 2409a had the statute-of limitations provision appear in subsection (f) of the statute as opposed to subsection (g).

Appellants argue that in the twelve-year period following 1965, they would not have had a cause of action to quiet title since there would have been no justiciable controversy as the cause of action could not have accrued until conditions began changing. While such argument evokes empathy, we do not believe that it comports with the limited waiver of sovereign immunity Congress intended, and in construing the statute of limitations strictly as a condition to the waiver of sovereign immunity, we must reject appellants' argument.

Vincent Murphy Chevrolet Co., Inc. v. United States, 766 F.2d at 452 (citations omitted).

"Because § 2409a limits the sovereign immunity of the United States, it must be interpreted according to federal law." Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d at 1177. "However, federal courts may properly look to state law as an aid in determining the application of statutory language to specific facts." Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d at 1177. "In particular, 'questions involving ownership, transfer and title to real estate have traditionally been resolved according to the laws of the state where the realty is located.'" Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d at 1177. "But 'such state law should be compatible with the purpose of [the legislation so as] to find the rule that will best effectuate the federal policy.'" Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d at 1177 (alteration in original).

**4.    28 U.S.C. § 2410.**

28 U.S.C. § 2410(a) provides:

(a)    Under the conditions prescribed in this section and section 1444 of this title for the protection of the United States, the United States may be named a party in any civil action or suit in any district court, or in any State court having jurisdiction of the subject matter --

(1)    to quiet title to,

(2)    to foreclose a mortgage or other lien upon,

-29-

(3)     to partition,

(4)     to condemn, or

(5)     of interpleader or in the nature of interpleader with respect to,

real or personal property on which the United States has or claims a mortgage or other lien.

28 U.S.C. § 2410(a).  28 U.S.C. § 1444 provides: "Any action brought under section 2410 of this title against the United States in any State court may be removed by the United States to the district court of the United States for the district and division in which the action is pending."  28 U.S.C. § 1444.  28 U.S.C. § 2410 is a "consent to suit . . . available for taxpayers challenging procedural irregularities in the establishment of a lien as well as third parties challenging a lien's efficacy." James v. United States, 970 F.2d at 753.  "This section waives the United States' sovereign immunity in a civil action to quiet title, foreclose a mortgage or lien, partition, condemn, or interplead with respect to property upon which the United States has or claims a lien."  Nat'l Commodity & Barter Ass'n, Nat'l Commodity Exch. v. Gibbs, 886 F.2d 1240, 1246 (10th Cir. 1989).  "Waivers of sovereign immunity under section 2410(a) must be read narrowly."  Schmidt v. King, 913 F.2d 837, 839 (10th Cir. 1990).  The waiver of immunity under 28 U.S.C. § 2410 "applies only to suits relating to government liens."  Stewart v. United States, 242 F.2d 49, 51(5th Cir. 1957)(citing Jones v. Tower Prod. Co., 38 F.2d 675 (10th Cir. 1943))(" Plaintiffs claim that such consent is given in 28 U.S.C.A. § 2410, but a reading of that statute shows that it applies only to suits relating to government liens.").  To the extent that there is not a conflict with federal law, federal courts look to state law to determine whether the United States has a valid lien.  See United States v. Brosnan, 363 U.S. 237, 241 (1960)("We nevertheless believe it desirable to adopt as federal law state law governing divestiture of federal tax liens, except to the extent that Congress may have

-30-

entered the field.").

## NEW MEXICO LAW REGARDING INTERPRETATION OF DEEDS

"The polestar of deed construction is the parties' intent." Bogle Farms, Inc. v. Baca, 122 N.M. 422, 432, 925 P.2d 1184, 1194 (1996).  Courts interpreting a deed must look "within the four corners of the . . . deed, which is the controlling document insofar as the final intention of the parties is concerned," unless there is some "ambiguity." Northrip v. Conner, 107 N.M. 139, 142-43, 754 P.2d 516, 519-20 (1988).  Courts in New Mexico "construe a deed to give effect to the intent of the grantor." Burnham v. City of Farmington, 125 N.M. 129, 134, 957 P.2d 1163, 1167 (Ct. App. 1998).  When construing a deed, New Mexico courts "follow rules of construction or presumptions when the deed is not clear." Burnham v. City of Farmington, 125 N.M. at 134, 957 P.2d at 1167. "It is fundamental that a deed must be read as a whole and while there may be some unexplained verbiage in part of the deed, it is well established that the granting clause is the main source for determining the estate or interest to be conveyed . . . ." Martinez v. Mundy, 61 N.M. 87, 91, 295 P.2d 209, 211-12 (1956), overruled on other grounds by Evans Fin. Corp. v. Strasser, 99 N.M. 788, 664 P.2d 986 (1983).  A deed "provision . . . which, under certain circumstances, works a forfeiture, should be construed most strongly against the grantors." Garry v. Atchison, Topeka & Santa Fe Ry. Co., 71 N.M. 370, 373, 378 P.2d 609, 611 (1963).

A reservation is defined as, "a clause in a deed or other instrument of conveyance by which the grantor creates, and reserves to himself, some right, interest, or profit in the estate granted, which had no previous existence as such, but is first called into being by the instrument reserving it; such as . . . an easement." Amoco Prod. Co. v. Sims, 97 N.M. 324, 326, 639 P.2d 1178, 1180 (1981). The party asserting the ownership of an easement has the burden to prove that the granting instrument created an easement.  See Amoco Prod. Co. v. Sims, 97 N.M. at 325, 639 P.2d at 1179

-31-

("The law is jealous of easement claims, and the burden is on the party asserting such a claim to prove it clearly.").  New Mexico courts have found the following language to create an easement: (i) "SUBJECT TO reservation by Grantor of a forty (40) foot road and utility easement along the north and west boundary lines," Camino Sin Pasada Neighborhood Ass'n v. Rockstroh, 119 N.M. 212, 213-14, 889 P.2d 247, 248-49 (Ct. App. 1994)(emphasis in original)(relying on extrinsic evidence to reach this conclusion based on the phrase "subject to" creating an ambiguity); (ii) "GRANTORS EXCEPT AND RESERVE a ten-foot driveway easement across the lands herein conveyed," Germany v. Murdock, 99 N.M. 679, 680-81, 662 P.2d 1346, 1347-48 (1983)(emphasis in original); and (iii) language providing for a "right of ingress and egress" from the land, Martinez v. Martinez, 93 N.M. 673, 674-65, 604 P.2d 366, 367-68 (1979).

"[I]f the language is unclear or ambiguous" in a restrictive covenant, New Mexico courts "will resolve the restrictive covenant in favor of the free enjoyment of the property and against restrictions."  Hill v. Cmty. of Damien of Molokai, 121 N.M. 353, 357, 911 P.2d 861, 865 (1996).  New Mexico courts "will not read restrictions on the use and enjoyment of the land into the covenant by implication."  Hill v. Cmty. of Damien of Molokai, 121 N.M. at 357-58, 911 P.2d at 865-66.  New Mexico courts "must interpret the covenant reasonably, but strictly, so as not to create an illogical, unnatural, or strained construction."  Hill v. Cmty. of Damien of Molokai, 121 N.M. at 358, 911 P.2d at 866.  New Mexico courts "must give words in the restrictive covenant their ordinary and intended meaning."  Hill v. Cmty. of Damien of Molokai, 121 N.M. at 358, 911 P.2d at 866.  "To ascertain the intention of the parties in construing a restrictive covenant, the language employed to express the covenant should be construed in the light of the whole of the instrument and the circumstances under which it was executed."  Lockwood v. Steiner, 101 N.M. 783, 784, 689 P.2d 932, 933 (1984).  Examples of provisions that New Mexico courts have found to be restrictive

covenants in deeds include: (i) "[n]o trailer, mobile home, basement, tent, shack, garage, barn or other outbuilding shall at any time be used as a residence, nor shall any residence of a temporary character be erected or permitted to remain," <u>Wilcox v. Timberon Protective Ass'n</u>, 111 N.M. 478, 484, 806 P.2d 1068, 1074 (Ct. App. 1990), <u>abrogated on other grounds by</u> <u>C.R. Anthony Co. v. Loretto Mall Partners</u>, 112 N.M. 504, 817 P.2d 238 (1991); and (ii) "[n]o lot shall ever be used for any purpose other than single family residence purposes," <u>Hill v. Cmty. of Damien of Molokai</u>, 121 N.M. at 358, 911 P.2d at 866.   Another restrictive covenant from New Mexico case law is as follows:

> The Country Club Tract may be used for a hotel and/or club house and commercial activities for profit, which generally accompany such establishments, such as restaurants, bars, rooms and halls for dancing, tennis courts, swimming pools, fishing, boating[,] and other athletic events and activities operated in connection with such hotel or club house only.

<u>Agua Fria Save the Open Space Ass'n v. Rowe</u>, 149 N.M. 812, 814, 255 P.3d 390, 392 (Ct. App. 2011).

A cause of action to enforce a restrictive covenant arises when the covenant is breached. <u>See</u> <u>Parker v. Beasley</u>, 40 N.M. 68, 54 P.2d 687, 689 (1936)("The courts are united in holding that upon breach of any covenant . . . a right of action arises as on an ordinary chose in action[5] . . . ."). When the plaintiff seeks to enforce a covenant in equity, a court has broad powers to fashion a remedy, but must protect the rights of all parties.  <u>See</u> <u>Jones v. Schoellkopf</u>, 138 N.M. 477, 485, 122 P.3d 844, 852 (Ct. App. 2005)("It is true that a court of equity has broad powers.  But, as indicated in the immediately preceding quotation, in fashioning relief, the court must protect the rights of all

---

[5]A chose in action is "[a] proprietary right in personam, such as a debt owed by another person, a share in a joint-stock company, or a claim for damages in tort."  <u>Black's Law Dictionary</u> 275 (9th ed. 2009).  Another definition for this term is "[t]he right to bring an action to recover a debt, money, or thing."  <u>Black's Law Dictionary</u> at 275.

parties." (citation omitted)).  A covenant remains on property in the event of a foreclosure.  See

Gorman v. Boehning, 55 N.M. 306, 310, 232 P.2d 701, 704 (1951)("A restrictive covenant is

something of value to all lots in a tract and cannot be divested by a stranger acquiring title adverse

to the common owner.").  Courts have recognized that a person seeking to enforce a covenant can,

in some cases, obtain a lien against property rather than an injunction seeking compliance with the

covenant.  See Oceanside Cmty. Ass'n v. Oceanside Land Co., 147 Cal. App. 3d 166, 177-78 (Cal.

App. 1983)("That the trial court chose to enforce the covenant through an equitable lien imposed

upon the land rather than by a mandatory injunction directed against Pine Tree was within its

discretion."); Glenbrook Homes Ass'n v. Mobeco Indus., Inc., No. A-97-745, 1999 WL 111306, at

*1 (Neb. App. 1999)(unpublished)("Pursuant to the Covenants, Glenbrook acquired a lien based on

Mobeco's failure to pay the assessments."); Rosario-Paolo, Inc. v. C & M Pizza Rest., Inc., 643

N.E.2d 85, 87 (N.Y. 1994)("Because of the promise to insure for plaintiff's benefit that is embodied

in the security agreement between plaintiff and C & M, plaintiff is entitled to enforce its covenant

with C & M to recover damages to the extent of its equitable lien . . . .").

## ANALYSIS

Because 28 U.S.C. § 1346(a) does not waive sovereign immunity against the United States

for suits for declaratory relief, there is no waiver of sovereign immunity for this suit Wells Fargo

has brought seeking declaratory relief against the HUD.  While the HUD has contractually

consented to joinder in a foreclosure suit regarding the property in question, it has not contractually

waived sovereign immunity for the relief Wells Fargo seeks.  Because the twelve-year statute of

limitations under 28 U.S.C. § 2409a has run for Wells Fargo's quiet title action against the HUD,

there is no waiver of sovereign immunity for suit under that statute.  Because the HUD does not hold

a lien on the property in question, 28 U.S.C. § 2410 does not provide for a waiver of sovereign

immunity for suit.  Because the Declaratory Judgment Act does not provide an independent basis for federal subject-matter jurisdiction or a waiver of sovereign immunity, it does not permit Wells Fargo to obtain the relief it seeks against the HUD.  The Court will grant the HUD's Nov. 15, 2011 Motion and dismiss all claims Wells Fargo has asserted against the HUD.  Because the HUD has consented to joinder to this foreclosure action, and does not oppose remaining a party to this action, the HUD will remain a party to the action while the foreclosure sale occurs.

I.   **WELLS FARGO HAS NOT ESTABLISHED THAT THE UNITED STATES HAS WAIVED SOVEREIGN IMMUNITY UNDER 28 U.S.C. § 1346(a)(2) FOR CLAIMS SEEKING DECLARATORY RELIEF.**

The HUD asserts that Wells Fargo cannot establish that the Court has subject-matter jurisdiction under 28 U.S.C. § 1346(a)(2), because that statute "empowers district courts to award damages but not to grant injunctive or declaratory relief."  Nov. 15, 2011 Motion at 7-8 (emphasis in original)(quoting Lee v. Thornton, 420 U.S. at 140).  Wells Fargo asserts that 28 U.S.C. § 1346(a)(2) provides for jurisdiction over cases where the United States is a defendant.  See Response to Mar. 24, 2011 Motion at 5-6.

28 U.S.C. § 1346(a)(2) provides:

(a)    The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:

. . .

(2)    Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort, except that the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort which are subject to sections 7104(b)(1) and 7107(a)(1) of title 41.

-35-

28 U.S.C. § 1346(a)(2).  The Supreme Court has held that this statute "empowers district courts to award damages but not to grant injunctive or declaratory relief."  Lee v. Thornton, 420 U.S. at 140.  The Tenth Circuit found the exercise of jurisdiction under this statute improper when the plaintiff "sought the equitable relief of rescission, while employing language designed to render the federal defendants liable in damages in the amount of the promissory note."  Ortiz v. United States, 661 F.2d at 830-31.  Accord McKay v. United States, 516 F.3d at 851 ("But this action involves a contractual, not a constitutional, obligation and plaintiff does not cite, nor have we found, any contract case holding that [28 U.S.C. § 1346(a)(2)] may be avoided . . . by forgoing the damages remedy the Act permits and seeking equitable relief it prohibits.").

28 U.S.C. § 1346(a)(2) does not provide a basis for a waiver of sovereign immunity in this case, because Wells Fargo does not seek damages, but rather declaratory relief, against the HUD.  The United States' agencies, such as HUD, have sovereign immunity absent a waiver.  See FDIC v. Meyer, 510 U.S. at 475 ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit").  Wells Fargo has not sought damages from the HUD in its Amended Complaint.  See Amended Complaint at 11-13.  The Supreme Court has held that 28 U.S.C. § 1346(a)(2) "empowers district courts to award damages but not to grant injunctive or declaratory relief."  Lee v. Thornton, 420 U.S. at 140.  The Tenth Circuit has similarly found this statute does not permit a plaintiff to seek equitable or declaratory relief against the United States.  See McKay v. United States, 516 F.3d at 851; Ortiz v. United States, 661 F.2d at 830-31.  While 28 U.S.C. § 1346(a)(2) contains a limited waiver of sovereign immunity, a waiver of sovereign immunity cannot be implied and must be unequivocally expressed.  See United States v. Nordic Vill., Inc., 503 U.S. at 33-34; United States v. Mitchell, 445 U.S. at 538; United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d at 930.  Thus, 28 U.S.C. § 1346(a)(2) does not provide a waiver of sovereign

immunity for the declaratory relief Wells Fargo seeks.

## II.   THE HUD DID NOT WAIVE SOVEREIGN IMMUNITY IN THE SPECIAL WARRANTY DEED OR IN THE SUBORDINATION AGREEMENT IN A WAY THAT WOULD PERMIT WELLS FARGO TO CHALLENGE HUD'S INTEREST IN THE CASA HERMOSA PROPERTY.

Wells Fargo argues that the HUD has contractually waived sovereign immunity in the Subordination Agreement. See Response to Nov. 15, 2011 Motion at 5-6. The HUD responds that Wells Fargo and its predecessor were not parties to those contracts, such that Wells Fargo cannot rely upon any waiver of sovereign immunity in those documents. See Reply to Response to Nov. 15, 2011 Motion at 5 ("Plaintiff, does so by incorrectly implying it has a right to sue under the Subordination Agreement despite plaintiff is not [sic] in privity of contract with HUD and it does not seek damages under 28 U.S.C. § 1346(a)(2).").

The Supreme Court has recognized that a waiver of sovereign immunity can take a contractual form. See C & L Enters., Inc. v. Citizen Band of Potawatomi Indian Tribe of Okla., 532 U.S. 411, 423 (2001)("For the reasons stated, we conclude that under the agreement the Tribe proposed and signed, the Tribe clearly consented to arbitration and to the enforcement of arbitral awards in Oklahoma state court; the Tribe thereby waived its sovereign immunity from C & L's suit."); Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 676 (1999)("We have even held that a State may, absent any contractual commitment to the contrary, alter the conditions of its waiver and apply those changes to a pending suit."). Cf. Library of Congress v. Shaw, 478 U.S. 310, 317 (1986)("Apart from constitutional requirements, in the absence of specific provision by contract or statute, or express consent . . . by Congress, interest does not run on a claim against the United States." (alteration in original)(internal quotation marks omitted)), superseded by statute on other grounds Civil Rights Act of 1991, Pub. L. No. 102-166, § 114, 105

Stat. 1071 (1991), as stated in Landgraf v. USI Film Prods., 511 U.S. 244 (1994).  In Orff v. United States, 545 U.S. 596, 601 (2005), the Supreme Court addressed a situation similar to the one presented in this case.  In that case, the Supreme Court was interpreting a statute that provided: "Consent is given to join the United States as a necessary party defendant in any suit to adjudicate, confirm, validate, or decree the contractual rights of a contracting entity and the United States regarding any contract executed pursuant to Federal reclamation law."  Orff v. United States, 545 U.S. at 601.  The Supreme Court held that all this statute waived regarding sovereign immunity was that it permitted joinder of the United States in a dispute to litigate the rights of other parties, in which the United States may have some interest regarding the resolution of that dispute as a necessary party, but did not permit a suit against the United States alone:

> This language is best interpreted to grant consent to join the United States in an action between other parties -- for example, two water districts, or a water district and its members -- when the action requires construction of a reclamation contract and joinder of the United States is necessary.  It does not permit a plaintiff to sue the United States alone.

Orff v. United States, 545 U.S. at 602.  The Supreme Court rejected the broader argument that the statute permitted waiver for suits against the United States.  See Orff v. United States, 545 U.S. at 601  ("This argument founders on the principle that a waiver of sovereign immunity must be strictly construed in favor of the sovereign.").  The Tenth Circuit has elaborated that a waiver of sovereign immunity cannot be by implication.  See Sac and Fox Nation v. Hanson, 47 F.3d 1061, 1063 (10th Cir. 1995)("In addition, we find that a waiver of sovereign immunity cannot be inferred from the Nation's engagement in commercial activity.").

The HUD consented, in the Special Warranty Deed, to be joined as a party to a foreclosure action.  See Special Warranty Deed at 27 ("Mortgagee shall provide Grantor with notice of such default and shall name Grantor as a party in such foreclosure action.").  The Subordination

Agreement states that the "HUD is willing to waive the restrictions set out in Articles VIII and IX in the event of such default and foreclosure . . . ." Subordination Agreement at 34. The first provision is highly similar to the statutory language with which the Supreme Court dealt in Orff v. United States. Much like the Supreme Court's conclusion in Orff v. United States, while the language in the Special Warranty Deed may constitute a waiver of sovereign immunity regarding the HUD's joinder in a foreclosure action, the language does not permit Wells Fargo to litigate the nature of the HUD's underlying interest in this lawsuit. See Orff v. United States, 545 U.S. at 601 ("This argument founders on the principle that a waiver of sovereign immunity must be strictly construed in favor of the sovereign."). The second provision contemplates the HUD contractually waiving the restrictions in Articles VIII and IX in the event of default and foreclosure, but nothing in that provision refers to the HUD consenting to determination of that issue in a suit that the mortgage holder brings or for declaratory relief to that effect. "[A] waiver of sovereign immunity must be strictly construed in favor of the sovereign." Orff v. United States, 545 U.S. at 601. "In addition, . . . a waiver of sovereign immunity cannot be inferred from" the United States' "engagement in commercial activity." Sac and Fox Nation v. Hanson, 47 F.3d at 1063. Construing these provisions strictly, the HUD has consented to joinder to a foreclosure action, but has not consented to the declaratory relief Wells Fargo seeks. Wells Fargo is not barred from litigating those issues at some point in the future, such as in a suit the HUD brings against it, but the HUD has not consented to litigation of those issues in this foreclosure action.

III.   **WELLS FARGO HAS NOT ESTABLISHED THAT THE UNITED STATES HAS WAIVED SOVEREIGN IMMUNITY UNDER 28 U.S.C. § 2409a GIVEN THE UNTIMELINESS OF WELLS FARGO'S QUIET TITLE ACTION.**

The HUD argues that the United States has not waived sovereign immunity under 28 U.S.C. § 2409a, because Wells Fargo has not brought its quiet title action within the twelve-year statute of

limitations, which it asserts serves as a jurisdictional bar.  See Nov. 15, 2011 Motion at 8-9.  Wells

Fargo contends that "the quiet title claim against HUD is not time barred because Plaintiff did not

have any claim or interest adverse to HUD until the Borrower defaulted in its performance, which

occurred in June, 2010."  Response to Nov. 15, 2011 Motion at 1.

28 U.S.C. § 1346(f) provides: "The district courts shall have exclusive original jurisdiction

of civil actions under section 2409a to quiet title to an estate or interest in real property in which an

interest is claimed by the United States."  28 U.S.C. § 1346(f).  28 U.S.C. § 2409a provides in

relevant part: "The United States may be named as a party defendant in a civil action under this

section to adjudicate a disputed title to real property in which the United States claims an interest,

other than a security interest or water rights."  28 U.S.C. § 2409a(a).  The QTA provides subject-

matter jurisdiction and a waiver of sovereign immunity for quiet title actions against the United

States.  See Match-E-Ba-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 2012 WL

2202936, at *5.

28 U.S.C. § 2409a(g) provides:

> Any civil action under this section, except for an action brought by a State, shall be
> barred unless it is commenced within twelve years of the date upon which it accrued.
> Such action shall be deemed to have accrued on the date the plaintiff or his
> predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. § 2409a(g).  As the Supreme Court has stated: "The limitations period is a central

condition of the consent given by the Act."  United States v. Mottaz, 476 U.S. at 843.  A plaintiff's

claim being timely under this statute of limitations is a jurisdictional prerequisite to suit under 28

U.S.C. § 2409a.  See Block v. North Dakota ex rel. Bd. of Univ and Sch. Lands, 461 U.S. at 287;

Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d at 1175

("Timeliness under subsection [(g)] is a jurisdictional prerequisite to suit under section 2409a."

(alteration in original)).

"The twelve-year limitations period is strictly construed in favor of the United States."  Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d at 1176.  The Tenth Circuit has "held that for purposes of determining when 'the claim' accrues under § 2409a(f), '[a]ll that is necessary is a reasonable awareness that the government claims some interest adverse to the plaintiffs.'"  Vincent Murphy Chevrolet Co., Inc. v. United States, 766 F.2d at 452.  "Knowledge of the claim's full contours is not required.  All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's."  Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d at 1176 (emphasis in original).  "[T]he United States need not assert a full legal title in the disputed property for the limitations period to accrue; the claimed adverse interest in the title of the property merely must be substantial enough to create a cloud on title."  Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d at 1176.  The Tenth Circuit has held that the knowledge of deed restrictions in place that benefitted the United States was sufficient to trigger the running of the statute of limitations under 28 U.S.C. § 2409a(f).  See Vincent Murphy Chevrolet Co., Inc. v. United States, 766 F.2d at 452 ("Appellants concede knowledge of a 'claim' -- the deed restrictions -- as early as 1965.  This is all that is necessary under § 2409a(f).").  The Tenth Circuit elaborated:

> While the Supreme Court in Block indicated that the statutes waiving immunity should not be construed in an unduly restrictive manner, it cautioned that these statutes could not be interpreted in such a manner as to "'extend the waiver beyond that which Congress intended.'"
>
> To hold that the twelve-year statute of limitations did not begin to run until conditions began changing would give rise to an interpretation of the term "claim" under § 2409a(f) which could extend the limitations period indefinitely.  We cannot extend the waiver of immunity under the quiet title act beyond that which Congress could have intended and we refuse to do so without a clear expression of legislative intent.

-41-

Appellants argue that in the twelve-year period following 1965, they would not have had a cause of action to quiet title since there would have been no justiciable controversy as the cause of action could not have accrued until conditions began changing.  While such argument evokes empathy, we do not believe that it comports with the limited waiver of sovereign immunity Congress intended, and in construing the statute of limitations strictly as a condition to the waiver of sovereign immunity, we must reject appellants' argument.

Vincent Murphy Chevrolet Co., Inc. v. United States, 766 F.2d at 452 (citations omitted).

While Wells Fargo argues that "the quiet title claim against HUD is not time barred because Plaintiff did not have any claim or interest adverse to HUD until the Borrower defaulted in its performance, which occurred in June, 2010," Response to Nov. 15, 2011 Motion at 1, that standard is inconsistent with the Supreme Court's and Tenth Circuit's precedent.  The Tenth Circuit has "held that for purposes of determining when 'the claim' accrues under § 2409a(f), '[a]ll that is necessary is a reasonable awareness that the government claims some interest adverse to the plaintiffs.'" Vincent Murphy Chevrolet Co., Inc. v. United States, 766 F.2d at 452.  "Knowledge of the claim's full contours is not required.  All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's." Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d at 1176 (emphasis in original).  Most importantly, the Tenth Circuit has held that knowledge of deed restrictions is sufficient to trigger the running of the twelve-year statute of limitations.  See Vincent Murphy Chevrolet Co., Inc. v. United States, 766 F.2d at 452 ("Appellants concede knowledge of a 'claim' -- the deed restrictions -- as early as 1965.  This is all that is necessary under § 2409a(f).").

The parties do not dispute that the Subordination Agreement waived, in the event of a default, the requirements contained in the Special Warranty Deed stated in Articles VIII and IX.  More specifically, the Subordination Agreement provides:

**WHEREAS**, the holders of the Refunding Bonds secured by the Mortgage

on the Real Property wish to assure themselves that in the event of a default under the terms of the Bonds, the Indenture by which such bonds are issued, or the Mortgage securing payment of the bonds, and in the event of foreclosure of the Mortgage, that the restrictions set out in Articles VIII and IX of the Special Warranty Deed will not be applicable to any new owner acquiring the Real Property as the result of such default and foreclosure; and

**WHEREAS**, HUD is willing to waive the restrictions set out in Articles VIII and IX in the event of such default and foreclosure, provided that the new owner is not a subsidiary or affiliate of Grantee . . . .

Subordination Agreement at 34 (emphasis in original).  The relevant provisions of Article IV in the

Special Warranty Deed are as follows:

(1)     If the Grantee, its successors, assigns or purchasers for value, sells, assigns, transfers or conveys the Property (collectively a "Sale"), the Sale proceeds, less any expenses incurred by the Grantee as approved by the Grantor consisting of (1) reasonable transaction costs, (2) purchase price paid by the Grantee for the Property, (3) amounts previously paid by the Grantee to the Grantor under Paragraph (2) of this Rider since the previous sale of the Property, or (4) other costs paid by Grantee as approved by Grantor, _i.e.,_ costs of renovation and rehabilitation other than routine maintenance and repairs, shall be assigned to the Grantor in the following amount:

(a)     For any sale which occurs between the date of the Deed and fifteen (15) years from the date of the Deed, one hundred percent (100%);

(b)     For any sale which occurs between sixteen and twenty (16-20) years from the date of the Deed, seventy-five percent (75%);

(c)     For any sale which occurs between twenty-one and thirty (21-30) years from the date of the Deed, fifty percent (50%); and

(d)     For any sale which occurs over thirty (30) years from the date of the Deed, twenty-five percent (25%);

. . . . .

(4)     Grantee acknowledges that Grantee is financing the acquisition and renovation of the Real Property through Grantee's Issuance of certain multi-family housing revenue bond acquisition notes and bonds which are known as the Multi-Family Housing Revenue Bonds (Casa Hermosa Project Series 1994A) in the aggregate principal amount of $1.255 million ("Notes") and Grantee's Multi-Family Housing Revenue Bonds (Casa Hermosa Project

-43-

Series 1994B), in an aggregate principal amount not to exceed $1.6 million ("Bonds").

In order to have such Notes and Bonds properly secured, Grantee must be able to grant a mortgage of first priority to secure payment of the Notes and the Bonds.  Accordingly, and notwithstanding anything contained herein to the contrary, the rights afforded to the United States Department of Housing and Urban Development as set forth in Section IV of this Special Warranty Deed shall be expressly subordinate to the terms of the mortgage granted to secure payment of such Notes and Bonds in the following particulars:

(a)    In the event Grantee defaults in any obligations undertaken by it pursuant to that certain Indenture dated October 5, 1994, between Southeastern New Mexico Affordable Housing Corporation and First Security Bank of New Mexico, N.A., as Trustee, the First Supplemental Indenture thereto dated October 5, 1994, and the Second Supplemental Indenture, the terms of the Notes or the Bonds, or the Mortgage on the Real Property pledged to secure payment of same, and in the further event as a result of such default, Mortgagor exercises its rights to foreclose the mortgage on the Real Property, then Grantor will not be entitled to participate in any equity in the property until such time as all costs of foreclosure and rehabilitation costs together with the mortgage debt secured by the Real Property and incurred in conjunction with the Issuance of the Multi-Family Housing Revenue Bonds Anticipation Notes (Casa Hermosa Project Series 1994A) and the Multi-Family Housing Revenue Bonds (Casa Hermosa Project Series 1994B) have been paid in full.

(b)    By executing this Special Warranty Deed, Grantor expressly consents to Grantee's granting of a mortgage to secure payment of the Bond Anticipation Notes and the Bonds hereinbefore referred to, and specifically stipulates and agrees that the issuance of such notes and bonds will not constitute a refinancing, nor will the Issuance of the bonds cause such transaction to fall within the provisions of Paragraph (VI2) of this Special Warranty Deed.

Special Warranty Deed at 25-26.

Wells Fargo seeks a declaration that Article IV's restrictions are inapplicable when it resells the property.  The parties do not dispute that, in 1994, the HUD sold through a Special Warranty Deed the property in question to the SNMAHC.  The parties do not dispute that, in late 1997, the HUD executed a Subordination Agreement to approve a refinancing of the property.  The

Subordination Agreement mentions Article IV from the Special Warranty Deed, but does not otherwise modify the applicability of this provision in the event of foreclosure. See Subordination Agreement at 33 (mentioning that the "Special Warranty Deed included a number of restrictions, including those found in the Special Warranty Deed under Article IV which is entitled 'Equity Participation'"). The Subordination Agreement states: "In all other particulars, the restrictions and terms of the Special Warranty Deed are hereby ratified and confirmed." Subordination Agreement at 35.

At least as early as late 1997, where the Subordination Agreement specifically referenced Article IV, First Security Bank, National Association -- Wells Fargo's predecessor in interest -- should have known about the restrictions in Article IV. First Security Bank was the one who provided the funds for the refinancing in late 1997, so it either knew or should have known about the contents of the deed to that property. See Trust Indenture at 1 (dated December 1, 1997), filed October 25, 2011 (Doc. 22-1); Mortgage Assignment of Rents and Security Agreement (dated December 1, 1997), filed October 25, 2011 (Doc. 22-3). Wells Fargo alleges in its Amended Complaint: "The Bonds were issued by Issuer pursuant to the Indenture and in accordance with the Bond Resolution adopted by the Issuer on October 18, 1997." Amended Complaint ¶ 11, at 2. Wells Fargo alleges that First Security Bank was its predecessor in interest. See Amended Complaint at 1 ("Plaintiff Wells Fargo Bank, N.A. (hereafter 'Trustee'), as Successor in Interest to First Security Bank, N.A. as Indenture Trustee . . . ."). 28 U.S.C. § 2409a(g) provides:

> Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff <u>or his predecessor in interest</u> knew or should have known of the claim of the United States.

28 U.S.C. § 2409a(g) (emphasis added). The Tenth Circuit has held that knowledge of deed

restrictions is sufficient to trigger the running of the twelve-year statute of limitations.  See Vincent Murphy Chevrolet Co., Inc. v. United States, 766 F.2d at 452 ("Appellants concede knowledge of a 'claim' -- the deed restrictions -- as early as 1965.  This is all that is necessary under § 2409a(f)."). Thus, as of December 1997, First Security Bank knew or should have known about the restrictions in Article IV.  Wells Fargo filed this suit in state court on November 24, 2010.  To fall within the twelve-year statute of limitations, Wells Fargo should have filed its suit by December 2009 at the latest.

Thus, Wells Fargo did not file the suit within 28 U.S.C. § 2409a(g)'s twelve-year statute of limitations.  As the Supreme Court has stated: "The limitations period is a central condition of the consent given by the Act."  United States v. Mottaz, 476 U.S. at 843.  A plaintiff's claim being timely under this statute of limitations is a jurisdictional prerequisite to suit under 28 U.S.C. § 2409a.  See Block v. North Dakota ex rel. Bd. of Univ and Sch. Lands, 461 U.S. at 287; Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d at 1175 ("Timeliness under subsection [(g)] is a jurisdictional prerequisite to suit under section 2409a." (alteration in original)).  Accordingly, given the untimeliness of the suit, there is no waiver of sovereign immunity under 28 U.S.C. § 2409a(g).

## IV.   WELLS FARGO HAS NOT ESTABLISHED THAT THE UNITED STATES HAS WAIVED SOVEREIGN IMMUNITY UNDER 28 U.S.C. § 2410 GIVEN THAT THE HUD DOES NOT HOLD A LIEN ON THE CASA HERMOSA PROPERTY.

The waiver of immunity under 28 U.S.C. § 2410 "applies only to suits relating to government liens."  Stewart v. United States, 242 F.2d at 51.  The parties dispute whether the language in Article IV of the Special Warranty Deed creates a covenant, an easement, or a lien.  28 U.S.C. § 2410 will create a waiver of sovereign immunity only if Article IV's language regarding creates a lien.

-46-

It is important to note at the outset that the Special Warranty Deed expressly refers to the existence of covenants within it.  <u>See</u> Special Warranty Deed at 23 ("The covenants set forth in this Deed shall run with the land hereby conveyed and, to the fullest extent permitted by law and equity, shall be binding for the benefit and in favor of and enforceable by Grantor and his successors in office.").  The relevant provisions of Article IV in the Special Warranty Deed are as follows:

    (1)    If the Grantee, its successors, assigns or purchasers for value, sells, assigns, transfers or conveys the Property (collectively a "Sale"), the Sale proceeds, less any expenses incurred by the Grantee as approved by the Grantor consisting of (1) reasonable transaction costs, (2) purchase price paid by the Grantee for the Property, (3) amounts previously paid by the Grantee to the Grantor under Paragraph (2) of this Rider since the previous sale of the Property, or (4) other costs paid by Grantee as approved by Grantor, <u>i.e.</u>, costs of renovation and rehabilitation other than routine maintenance and repairs, shall be assigned to the Grantor in the following amount:

        (a)    For any sale which occurs between the date of the Deed and fifteen (15) years from the date of the Deed, one hundred percent (100%);

        (b)    For any sale which occurs between sixteen and twenty (16-20) years from the date of the Deed, seventy-five percent (75%);

        (c)    For any sale which occurs between twenty-one and thirty (21-30) years from the date of the Deed, fifty percent (50%); and

        (d)    For any sale which occurs over thirty (30) years from the date of the Deed, twenty-five percent (25%);

. . . . .

    (4)    Grantee acknowledges that Grantee is financing the acquisition and renovation of the Real Property through Grantee's Issuance of certain multi-family housing revenue bond acquisition notes and bonds which are known as the Multi-Family Housing Revenue Bonds (Casa Hermosa Project Series 1994A) in the aggregate principal amount of $1.255 million ("Notes") and Grantee's Multi-Family Housing Revenue Bonds (Casa Hermosa Project Series 1994B), in an aggregate principal amount not to exceed $1.6 million ("Bonds").

        In order to have such Notes and Bonds properly secured, Grantee must be able to grant a mortgage of first priority to secure payment of the Notes and

the Bonds. Accordingly, and notwithstanding anything contained herein to the contrary, the rights afforded to the United States Department of Housing and Urban Development as set forth in Section IV of this Special Warranty Deed shall be expressly subordinate to the terms of the mortgage granted to secure payment of such Notes and Bonds in the following particulars:

(a)     In the event Grantee defaults in any obligations undertaken by it pursuant to that certain Indenture dated October 5, 1994, between Southeastern New Mexico Affordable Housing Corporation and First Security Bank of New Mexico, N.A., as Trustee, the First Supplemental Indenture thereto dated October 5, 1994, and the Second Supplemental Indenture, the terms of the Notes or the Bonds, or the Mortgage on the Real Property pledged to secure payment of same, and in the further event as a result of such default, Mortgagor exercises its rights to foreclose the mortgage on the Real Property, then Grantor will not be entitled to participate in any equity in the property until such time as all costs of foreclosure and rehabilitation costs together with the mortgage debt secured by the Real Property and incurred in conjunction with the Issuance of the Multi-Family Housing Revenue Bonds Anticipation Notes (Casa Hermosa Project Series 1994A) and the Multi-Family Housing Revenue Bonds (Casa Hermosa Project Series 1994B) have been paid in full.

(b)     By executing this Special Warranty Deed, Grantor expressly consents to Grantee's granting of a mortgage to secure payment of the Bond Anticipation Notes and the Bonds hereinbefore referred to, and specifically stipulates and agrees that the issuance of such notes and bonds will not constitute a refinancing, nor will the Issuance of the bonds cause such transaction to fall within the provisions of Paragraph (VI2) of this Special Warranty Deed.

Special Warranty Deed at 25-26. To have full context regarding the language in this portion of the deed, it is important to consider other portions of the deed. Article VIII in the Special Warranty Deed provides:

(1)     The Grantee covenants that Twenty (20) units in the Property shall be maintained as housing for low- and moderate-income persons or families, which shall be defined as follows:

Families, elderly, or handicapped individuals with adjusted annual gross income at or below eighty (80) percent of the median income for the area.

-48-

(2)     This covenant shall continue in effect for a period of fifteen (15) years from the date of this Deed, or such earlier time as the Grantor may specify in writing.  During such period if the number of units occupied by low- and moderate-income persons or families falls below the number of units specified in Paragraph (1) above, the Grantee must seek to rent a sufficient number of units to low- and moderate-income persons or families to comply with Paragraph (1).

Special Warranty Deed at 28.  Article IX in the Special Warranty Deed provides:

(1)     The Grantee covenants that the rents for sixty-eight (68) units in the Property shall remain affordable for moderate-incoming persons or families, which shall be defined as follows:

> Families, elderly, or handicapped individuals with adjusted annual gross income at or below eighty percent (60%) of the median income for the area.

(2)     This covenant shall continue in effect for a period of thirty (30) years from the date of this Deed, or such earlier time as the Grantor may specify in writing.  During such period if the number of units occupied by moderate-income persons or families falls below the number of units specified in Paragraph (1) above, the Grantee must seek to rent a sufficient number of units to moderate-income persons or families to comply with Paragraph (1).

Special Warranty Deed at 28.

28 U.S.C. § 2410 does not define the term lien.  "When a statute includes a term with a particular legal meaning based on prior precedent, courts presume that the drafter of the statute intended the term to have that particular legal meaning."  United States v. Ganadonegro, No. 09-0312, 2012 WL 592419, at *12 (D.N.M. Feb. 14, 2012)(Browning, J.)(citing Clay v. United States, 537 U.S. 522, 527 (2003)).  Black's Law Dictionary defines the term lien as follows: "A legal right or interest that a creditor has in another's property, lasting usu. until a debt or duty that it secures is satisfied."  Black's Law Dictionary 1006 (9th ed. 2009).  A lien often permits the lienholder to, if the lien remains unpaid, to foreclose on the property subject to the lien.  See City of Hobbs v. Chesport, Ltd., 76 N.M. 609, 611, 417 P.2d 210, 212 (1966)(discussing a suit that "was instituted

for judgment in the amount of the lien and for foreclosure of the lien," in which the "trial court rendered judgment against defendant and ordered foreclosure of the lien for unpaid assessments covering the period from October 1, 1962, to April 30, 1963"); 5 H. Tiffany, The Law of Real Property § 1560, at 651-52 (3d ed. 1939 & Supp. 2011)(recognizing that an equitable lien carries with it "rights [that] involve a personal obligation upon the owner of land, which equity will enforce against the land, ordinarily by a decree for the sale thereof").[6]  Many liens arise as the result of a statute providing for the creation of such lien, see Black's Law Dictionary at 1006-10 (referring to various statutory liens such as agricultural liens, architect's liens, hospital liens, hotelkeeper's liens, mechanic's liens, and tax liens), arise from the execution of a judgment or out of a court proceeding, see Black's Law Dictionary at 1007-08 (referring to judgment liens, judicial liens, and garnishment liens), or arise under common law based on the lienholder performing some service for another or coming into possession of another's property in connection with performing a service, see Black's Law Dictionary at 1006-10 (referring to agent's liens, banker's liens, carrier's liens, hotelkeeper's liens, manufacturer's liens, and warehouser's liens).  None of those liens, either based on the nature in which they arise or the forms of transactions in which they appear, are comparable to provisions in dispute for the Casa Hermosa property.

Equitable liens appear to be the most comparable form of lien to the Casa Hermosa property transaction and to the nature of the arrangement outlined in Article IV.  An equitable lien is "[a] right, enforceable only in equity, to have a demand satisfied from a particular fund or specific property."  Black's Law Dictionary at 1007.  An equitable lien

_____

[6]The Supreme Court of New Mexico has cited The Law of Real Property as an authoritative treatise.  See, e.g., Heimann v. Adee, 122 N.M. 340, 347, 924 P.2d 1352, 1359 (1996)(quoting The Law of Real Property); Archuleta v. Pina, 86 N.M. 94, 98, 519 P.2d 1175, 1179 (1974)(quoting The Law of Real Property).

arises mainly in four circumstances: (1) when an occupant of land, believing in good faith to be the owner of that land, makes improvements, repairs, or other expenditures that permanently increase the lands value, (2) when one of two or more joint owners makes expenditures of that kind, (3) when a tenant for life completes permanent and beneficial improvements to the estate begun earlier by the testator, and (4) when land or other property is transferred subject to the payment of debts, legacies, portions, or annuities to third persons.

Black's Law Dictionary at 1007.  A leading property treatise discusses in more detail what qualifies as an equitable lien:

An "equitable lien" is created by a provision, in a conveyance inter vivos or in a will, charging the land, in the hands of the grantee or devisee, with the payment of debts or legacies.  So, land may be charged by will, or in a family settlement, with the payment of an annuity, or with the support of some person other than the owner.  And occasionally a testator charges upon particular land devised a sum or sums to be paid to beneficiaries named for the purpose of equalizing the distribution of his property.  The imposition of such a charge in effect involves an obligation upon the devisee or grantee to pay the debt or legacies, to pay the annuity, or to furnish support, as the case may be, under penalty, if he fails so to do, of having the land sold, or perhaps mortgaged, by decree of a court of equity, and the proceeds applied, so far as may be necessary, to the carrying out of the purposes declared.  Such charge is somewhat analogous to a trust created in favor of one person, upon a devise or conveyance to another; but it is not properly a trust, there being an entire absence of any fiduciary relation between the owner of the land and the person entitled to the benefit of the charge.

5 H. Tiffany, supra § 1560, at 651-52.  The Supreme Court of New Mexico has stated: "We have previously held that the intention of a promissor to create a lien must be clearly disclosed in the agreement before an equitable lien arises."  First Nat'l Bank in Tucumcari v. Berger Briggs Real Estate & Ins., Inc., 89 N.M. 185, 186, 548 P.2d 863, 864 (1976)(citing Reserve Plan, Inc. v. Peters, 71 N.M. 25, 375 P.2d 576 (1962)).  As the Supreme Court of New Mexico has related, the intent to create of a lien may be demonstrated as follows:

"In the creation of a lien by express contract, the agreement must clearly show an intention to create such lien, the property sought or intended to be charged must be clearly described or identified, and the property must be distinctly appropriated to or dedicated to, or held as security for, the payment of the debt or obligation in question."

First Nat'l Bank in Tucumcari v. Berger Briggs Real Estate & Ins., Inc., 89 N.M. at 187, 548 P.2d at 865 (quoting 51 Am. Jur. 2d Liens § 27 (1970)).

A covenant, on the other hand, is defined as: "A formal agreement or promise, usu. in a contract or deed, to do or not do a particular act." Black's Law Dictionary at 419. A restrictive covenant is defined as: "A private agreement, usu. in a deed or lease, that restricts the use or occupancy of real property, esp. by specifying lot sizes, building lines, architectural styles, and the uses to which the property may be put." Black's Law Dictionary at 421. Restrictive covenants "are calculated to render [a piece of land's] enjoyment more beneficial." 3 H. Tiffany, supra § 848, at 441. Examples of provisions that New Mexico courts have found to be restrictive covenants in deeds include: (i) "[n]o trailer, mobile home, basement, tent, shack, garage, barn or other outbuilding shall at any time be used as a residence, nor shall any residence of a temporary character be erected or permitted to remain," Wilcox v. Timberon Protective Ass'n, 111 N.M. at 484, 806 P.2d at 1074; and (ii) "[n]o lot shall ever be used for any purpose other than single family residence purposes," Hill v. Cmty. of Damien of Molokai, 121 N.M. at 358, 911 P.2d at 866. Another restrictive covenant from New Mexico case law is as follows:

> The Country Club Tract may be used for a hotel and/or club house and commercial activities for profit, which generally accompany such establishments, such as restaurants, bars, rooms and halls for dancing, tennis courts, swimming pools, fishing, boating[,] and other athletic events and activities operated in connection with such hotel or club house only.

Agua Fria Save the Open Space Ass'n v. Rowe, 149 N.M. at 814, 255 P.3d at 392.

### A. THE LANGUAGE IN ARTICLES VIII AND IX OF THE SPECIAL WARRANTY DEED DOES NOT CREATE LIENS.

The covenants in the New Mexico cases discussed above are similar to the language contained in Articles VIII and IX of the Special Warranty Deed. Article VIII in the Special

-52-

Warranty Deed provides in part:

> (1)    The Grantee covenants that Twenty (20) units in the Property shall be maintained as housing for low- and moderate-income persons or families, which shall be defined as follows:
>
>> Families, elderly, or handicapped individuals with adjusted annual gross income at or below eighty (80) percent of the median income for the area.
>
> (2)    This covenant shall continue in effect for a period of fifteen (15) years from the date of this Deed, or such earlier time as the Grantor may specify in writing.  During such period if the number of units occupied by low- and moderate-income persons or families falls below the number of units specified in Paragraph (1) above, the Grantee must seek to rent a sufficient number of units to low- and moderate-income persons or families to comply with Paragraph (1).

Special Warranty Deed at 28.  Article IX in the Special Warranty Deed provides:

> (1)    The Grantee covenants that the rents for sixty-eight (68) units in the Property shall remain affordable for moderate-incoming persons or families, which shall be defined as follows:
>
>> Families, elderly, or handicapped individuals with adjusted annual gross income at or below eighty percent (60%) of the median income for the area.
>
> (2)    This covenant shall continue in effect for a period of thirty (30) years from the date of this Deed, or such earlier time as the Grantor may specify in writing.  During such period if the number of units occupied by moderate-income persons or families falls below the number of units specified in Paragraph (1) above, the Grantee must seek to rent a sufficient number of units to moderate-income persons or families to comply with Paragraph (1).

Special Warranty Deed at 28.

The language in Articles VIII and IX creates restrictive covenants.  "To ascertain the intention of the parties in construing a restrictive covenant, the language employed to express the covenant should be construed in the light of the whole of the instrument and the circumstances under which it was executed."  Lockwood v. Steiner, 101 N.M. at 784, 689 P.2d at 933.  A restrictive

covenant is defined as "[a] private agreement, usu. in a deed or lease, that restricts the use or occupancy of real property, esp. by specifying lot sizes, building lines, architectural styles, and the uses to which the property may be put." Black's Law Dictionary at 421 (emphasis added). These covenants "are calculated to render [a piece of land's] enjoyment more beneficial." 3 H Tiffany, supra § 848, at 441 (emphasis added). These provisions make the land more useful to the grantor, the HUD, and limit the uses to which the property may be put. They restrict the use of the land to provide housing to certain individuals of lesser means. The restrictions are comparable to a restriction limiting the occupancy of a house to single family homes. See Hill v. Cmty. of Damien of Molokai, 121 N.M. at 358, 911 P.2d at 866 ("No lot shall ever be used for any purpose other than single family residence purposes."). There is nothing in these provisions that specifies that the covenantor -- SNMAHC -- owes any monetary obligation that could potentially subject the property to foreclosure -- language that would likely appear if the parties intended to create a lien. See 5 H. Tiffany, supra § 1560, at 651 ("An 'equitable lien' is created by a provision, in a conveyance inter vivos or in a will, charging the land, in the hands of the grantee or devisee, with the payment of debts or legacies."). Furthermore, other portions of the Special Warranty Deed expressly refer to the existence of covenants in the deed. See Special Warranty Deed at 23 ("The covenants set forth in this Deed shall run with the land hereby conveyed and, to the fullest extent permitted by law and equity, shall be binding for the benefit and in favor of and enforceable by Grantor and his successors in office."). "In order to create a covenant, neither the word 'covenant,' nor any other particular word, is necessary . . . ." 3 H. Tiffany, supra, § 849, at 443. Looking at the Special Warranty Deed's language and the parties' intent based on the language within the four corners of the deed, Article VIII and IX create restrictive covenants. See Lockwood v. Steiner, 101 N.M. at 784, 689 P.2d at 933.

-54-

Furthermore, while these restrictive covenants are somewhat different than other restrictive covenants in that they expire after a period of time passes, New Mexico courts have discussed covenants that contained similar language where the covenants might terminate provided certain conditions occur:

> All of the covenants [herein] shall run with the ownership of the above described property and shall be binding on the undersigned parties and all persons claiming under them until December 31, 1995, at which time said covenants shall be automatically extended for periods of ten years unless by vote of a majority in number of the then owners of lots and tracts within the exterior boundaries of the land described in Section 1-Blanket Restrictions, hereof, it is agreed to change the said covenants in whole or in part.
>
> Provided, however, that at any time hereafter any of said covenants or restrictions, in whole or in part, except the Blanket Restrictions in Section 1 hereof, may be alleviated, [amended], released or extinguished as to any block or tract by written instrument duly executed, acknowledged and recorded by three-fourths of the owners of said block or tract voting according to front foot holding, each front foot counting as one vote, and provided further that the undersigned now own land within the aforesaid boundaries or in close proximity thereto, and that these covenants are a general plan for the benefit of all and any of said land, and consequently that if said restrictions are alleviated or released as aforesaid at any time within ten years from the date hereof, and if at such time Bruce Griffith and Georgia . . . Griffith, or either of them, own any land within the aforesaid boundaries, then in addition to the aforesaid vote of property owners, it shall also be necessary to obtain the consent thereto of the undersigned.

Agua Fria Save the Open Space Ass'n v. Rowe, 149 N.M. at 814, 255 P.3d at 392 (alterations in original).  It is generally permissible for parties to a deed to limit the duration of a covenant:

> Where each deed conveying lots in a development contains a restrictive covenant against use of the property for other than residential purposes, but provides that such restriction should apply only for a limited period from the date of the conveyance, the mutuality of the covenants among the lots owners expires at the end of such period after the conveyance of the first lot, and thereafter it is not enforceable by one lot owner against another.

20 Am. Jur. 2d Covenants § 162, at 687 (2005).  Thus, that the restrictions in Article VIII and IX expire after a period of time does not undercut a finding that they are restrictive covenants.

Lastly, these provisions are not easements.  Their language is much more comparable to restricting the use of the land, like a restrictive covenant, rather than that of an easement -- which often reserves to the grantor a right of physical access to the property or a right of way to the property.  Black's Law Dictionary defines the term easement as "[a]n interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose (such as to cross it for access to a public road)."  Black's Law Dictionary at 585-86.  The party asserting the ownership of an easement has the burden to prove that the granting instrument created an easement.  See Amoco Prod. Co. v. Sims, 97 N.M. at 325, 639 P.2d at 1179 ("The law is jealous of easement claims, and the burden is on the party asserting such a claim to prove it clearly.").  The Court has carefully compared the language in Articles VIII and IX, which govern whom the grantee must have occupy the property, to easements in other New Mexico cases, and concludes that no easement was granted.   New Mexico courts have found the following language to create an easement: (i) "SUBJECT TO reservation by Grantor of a forty (40) foot road and utility easement along the north and west boundary lines," Camino Sin Pasada Neighborhood Ass'n v. Rockstroh, 119 N.M. at 213-14, 889 P.2d at 248-49 (emphasis in original)(relying on extrinsic evidence to reach this conclusion based on the phrase "subject to" creating an ambiguity); (ii) "GRANTORS EXCEPT AND RESERVE a ten-foot driveway easement across the lands herein conveyed," Germany v. Murdock, 99 N.M. at 680-81, 662 P.2d at 1347-48 (emphasis in original); and (iii) language providing for a "right of ingress and egress" from the land, Martinez v. Martinez, 93 N.M. at 674-65, 604 P.2d at 367-68.  Accordingly, the Court finds that Articles VIII and IX create restrictive covenants.

### B.   THE LANGUAGE IN ARTICLE IV OF THE SPECIAL WARRANTY DEED DOES NOT CREATE A LIEN.

To properly assess what form of interest the language in Article IV provides to the HUD, it is worth looking at the enforcement mechanisms for liens as opposed to covenants. The standard remedy for enforcement of a lien is to sue to enforce the lien and to seek foreclosure of the property, with the proceeds from the sale going to satisfy the lien. See, e.g., 77 Am. Jur. 2d Vendor and Purchaser § 489 ("In the absence of any statutory provision specifically authorizing the foreclosure of land contracts, the usual remedy to enforce a lien expressly reserved by the vendor is by a suit in equity for the sale of the land and the application of its proceeds to the satisfaction of the unpaid purchase money."). When the plaintiff seeks to enforce a covenant in equity, a court has broad powers to fashion a remedy -- often awarding injunctive relief to force compliance with the covenant. See Jones v. Schoellkopf, 138 N.M. at 485, 122 P.3d at 852 ("It is true that a court of equity has broad powers. But, as indicated in the immediately preceding quotation, in fashioning relief, the court must protect the rights of all parties." (citation omitted)); 20 Am. Jur. 2d Covenants § 262 ("Injunctive relief is available as a remedy against the breach of a restrictive covenant. This relief may be either a restraining injunction against the violation of the covenant, or, in the case of structures already erected, a mandatory injunction directing removal." (footnotes omitted)). Courts have recognized that a person seeking to enforce a covenant can, in some cases, obtain a lien against property rather than an injunction seeking compliance with the covenant. See Oceanside Cmty. Ass'n v. Oceanside Land Co., 147 Cal. App. 3d at 177-78 ("That the trial court chose to enforce the covenant through an equitable lien imposed upon the land rather than by a mandatory injunction directed against Pine Tree was within its discretion."); Glenbrook Homes Ass'n v. Mobeco Indus., Inc., 1999 WL 111306, at *1 ("Pursuant to the Covenants, Glenbrook acquired a lien based on

Mobeco's failure to pay the assessments."); Rosario-Paolo, Inc. v. C & M Pizza Rest., Inc., 643

N.E.2d at 87 ("Because of the promise to insure for plaintiff's benefit that is embodied in the security

agreement between plaintiff and C & M, plaintiff is entitled to enforce its covenant with C & M to

recover damages to the extent of its equitable lien . . . .").

Article IV provides for remedies that will be available and certain procedures to follow in

the event of a sale of the property or foreclosure.  The relevant provisions of Article IV in the

Special Warranty Deed are as follows:

(1) If the Grantee, its successors, assigns or purchasers for value, sells, assigns, transfers or conveys the Property (collectively a "Sale"), the Sale proceeds, less any expenses incurred by the Grantee as approved by the Grantor consisting of (1) reasonable transaction costs, (2) purchase price paid by the Grantee for the Property, (3) amounts previously paid by the Grantee to the Grantor under Paragraph (2) of this Rider since the previous sale of the Property, or (4) other costs paid by Grantee as approved by Grantor, i.e., costs of renovation and rehabilitation other than routine maintenance and repairs, shall be assigned to the Grantor in the following amount:

 (a) For any sale which occurs between the date of the Deed and fifteen (15) years from the date of the Deed, one hundred percent (100%);

 (b) For any sale which occurs between sixteen and twenty (16-20) years from the date of the Deed, seventy-five percent (75%);

 (c) For any sale which occurs between twenty-one and thirty (21-30) years from the date of the Deed, fifty percent (50%); and

 (d) For any sale which occurs over thirty (30) years from the date of the Deed, twenty-five percent (25%);

. . . . .

(4) Grantee acknowledges that Grantee is financing the acquisition and renovation of the Real Property through Grantee's Issuance of certain multi-family housing revenue bond acquisition notes and bonds which are known as the Multi-Family Housing Revenue Bonds (Casa Hermosa Project Series 1994A) in the aggregate principal amount of $1.255 million ("Notes") and Grantee's Multi-Family Housing Revenue Bonds (Casa Hermosa Project Series 1994B), in an aggregate principal amount not to exceed $1.6 million

-58-

("Bonds").

In order to have such Notes and Bonds properly secured, Grantee must be able to grant a mortgage of first priority to secure payment of the Notes and the Bonds.  Accordingly, and notwithstanding anything contained herein to the contrary, the rights afforded to the United States Department of Housing and Urban Development as set forth in Section IV of this Special Warranty Deed shall be expressly subordinate to the terms of the mortgage granted to secure payment of such Notes and Bonds in the following particulars:

(a) In the event Grantee defaults in any obligations undertaken by it pursuant to that certain Indenture dated October 5, 1994, between Southeastern New Mexico Affordable Housing Corporation and First Security Bank of New Mexico, N.A., as Trustee, the First Supplemental Indenture thereto dated October 5, 1994, and the Second Supplemental Indenture, the terms of the Notes or the Bonds, or the Mortgage on the Real Property pledged to secure payment of same, and in the further event as a result of such default, Mortgagor exercises its rights to foreclose the mortgage on the Real Property, then Grantor will not be entitled to participate in any equity in the property until such time as all costs of foreclosure and rehabilitation costs together with the mortgage debt secured by the Real Property and incurred in conjunction with the Issuance of the Multi-Family Housing Revenue Bonds Anticipation Notes (Casa Hermosa Project Series 1994A) and the Multi-Family Housing Revenue Bonds (Casa Hermosa Project Series 1994B) have been paid in full.

(b) By executing this Special Warranty Deed, Grantor expressly consents to Grantee's granting of a mortgage to secure payment of the Bond Anticipation Notes and the Bonds hereinbefore referred to, and specifically stipulates and agrees that the issuance of such notes and bonds will not constitute a refinancing, nor will the Issuance of the bonds cause such transaction to fall within the provisions of Paragraph (VI2) of this Special Warranty Deed.

Special Warranty Deed at 25-26.  Much like the provisions in Articles VIII and IX, some of these provisions in the Special Warranty Deed can change with the passage of time, specifically how much money the grantee owes to the HUD if it sells the property.  See Special Warranty Deed at 25.

New Mexico case law has discussed similar provisions that specify certain events that may occur in the event of a breach of a covenant, or outline certain rights and remedies available to those

-59-

seeking to enforce a covenant.  For instance, a provision mentioned in one case provided:

> The Association, or any owner or the successor in interest of an owner, shall have the right to enforce by proceedings at law or in equity, all restrictions, conditions, covenants, reservations, liens and charges now or hereafter imposed by the provisions of this Declaration or any amendment thereto, including the right to prevent the violation of any such restrictions, conditions, covenants or reservations and the right to recover damages or other dues for such violation; provided, however, that with respect to assessment liens, the Association shall have the exclusive right to the enforcement thereof.

Allen v. Timberlake Ranch Landowners Ass'n, 138 N.M. 318, 323, 119 P.3d 743, 748 (Ct. App. 2005).  A provision in a different case allows for specific damages in the event of nonpayment of homeowner's association fees, with the Court of Appeals of New Mexico referring to this language as "the Remedies part of the previous covenants":

10. REMEDIES

> A.    The Association, the Committee or any party to whose benefit these Restrictions inure, including Declarant, its successors and assigns, may proceed at law or in equity to prevent the occurrence, continuation or violation of any of these Restrictions[.]

The analogous part of the Supplemental Declaration provides in paragraph 3:

> A.    Declarant shall assess and the Property Owner of each Homesite shall pay to Declarant a nonrefundable annual assessment, plus gross receipts tax, if applicable, to be used only for the improvement, maintenance, upkeep, repair and operation of and additions to the Amenities . . . .

> B.    If any assessment is not paid in full when due, Declarant may charge a late fee of $15 per month and the unpaid portion shall bear interest from the due date at the rate of eight percent per annum . . . .

> C.    The property Owner's obligations under this Paragraph 3 shall be a covenant running with the land and shall be binding upon the Property Owner and upon all parties having or acquiring any right, title or interest in a Homesite owned by

-60-

> Property Owner. Declarant or the Association, as may be agreed between them, may enforce the provisions of this Paragraph 3.

Angel Fire Resort Operations, LLC v. Corda, 138 N.M. 50, 52, 116 P.2d 841, 843 (Ct. App. 2005)(alterations in original).

Article IV imposes an obligation on the grantee to hold the property for a certain period of time or to disgorge the profits from a resale of the property:

> If the Grantee, its successors, assigns or purchasers for value, sells, assigns, transfers or conveys the Property (collectively a "Sale"), the Sale proceeds, less any expenses incurred by the Grantee as approved by the Grantor consisting of (1) reasonable transaction costs, (2) purchase price paid by the Grantee for the Property, (3) amounts previously paid by the Grantee to the Grantor under Paragraph (2) of this Rider since the previous sale of the Property, or (4) other costs paid by Grantee as approved by Grantor, i.e., costs of renovation and rehabilitation other than routine maintenance and repairs, shall be assigned to the Grantor in the following amount . . . .

Special Warranty Deed at 25. If the grantee never sells the property, this provision never comes into play. This restriction phases out gradually over time in the form of reducing the amount owed to the HUD if a sale occurs, although it never goes away entirely:

> (a)   For any sale which occurs between the date of the Deed and fifteen (15) years from the date of the Deed, one hundred percent (100%);
>
> (b)   For any sale which occurs between sixteen and twenty (16-20) years from the date of the Deed, seventy-five percent (75%);
>
> (c)   For any sale which occurs between twenty-one and thirty (21-30) years from the date of the Deed, fifty percent (50%); and
>
> (d)   For any sale which occurs over thirty (30) years from the date of the Deed, twenty-five percent (25%) . . . .

Special Warranty Deed at 25. These time periods correspond to the amount of time the restrictive covenants in Article VIII and IX remain in effect -- fifteen years and thirty years respectively. Looking at the instrument as a whole, the provisions in this Article IV are another way of ensuring

compliance with the restrictive covenants in Article VIII and IX.  See Lockwood v. Steiner, 101 N.M. at 784, 689 P.2d at 933.

Unlike a lien, the grantee owed no financial obligation to the HUD under Article IV, and the HUD had no rights to enforce under this provision, at the time of the execution of the Special Warranty Deed.  A lien is "[a] legal right or interest that a creditor has in another's property, lasting usu. until a debt or duty that it secures is satisfied."  Black's Law Dictionary at 1006.  No debt or duty arises under these restrictions in Article IV if the grantee does not sell the property.  Even if a sale occurs, there may be no amount that the HUD should receive under the formula outlined in Article IV, which provides the HUD with a right to a certain amount of funds after subtracting a variety of costs:

> the Sale proceeds, less any expenses incurred by the Grantee as approved by the Grantor consisting of (1) reasonable transaction costs, (2) purchase price paid by the Grantee for the Property, (3) amounts previously paid by the Grantee to the Grantor under Paragraph (2) of this Rider since the previous sale of the Property, or (4) other costs paid by Grantee as approved by Grantor, i.e., costs of renovation and rehabilitation other than routine maintenance and repairs shall be assigned to the Grantor in the following amount . . . .

Special Warranty Deed at 25.  That arrangement is more like a covenant, where the cause of action for enforcement arises upon breach of the covenant.  See Parker v. Beasley, 40 N.M. 68, 54 P.2d 687, 689 (1936)("The courts are united in holding that upon breach of any covenant . . . a right of action arises as on an ordinary chose in action . . . .").

Effectively, based on the language in the Special Warranty Deed, the parties intended to limit the ability of the grantee to resell the property for a profit until after a certain amount of time occurred to strengthen the effect of the restrictive covenants in Article VIII and IX.  A restrictive covenant is defined as: "A private agreement, usu. in a deed or lease, that restricts the use or occupancy of real property, esp. by specifying lot sizes, building lines, architectural styles, and the

uses to which the property may be put." Black's Law Dictionary at 421 (emphasis added). Restrictive covenants "are calculated to render [a property's] enjoyment more beneficial." 3 H Tiffany, supra § 848, at 441 (emphasis added). These provisions make the land more useful to the grantor, the HUD, by limiting when the property may be sold, preventing the grantee from turning around and selling the property for a profit, and strengthening the effect of Articles VIII and IX. New Mexico courts "must give words in the restrictive covenant their ordinary and intended meaning." Hill v. Cmty. of Damien of Molokai, 121 N.M. at 358, 911 P.2d at 866. "To ascertain the intention of the parties in construing a restrictive covenant, the language employed to express the covenant should be construed in the light of the whole of the instrument and the circumstances under which it was executed." Lockwood v. Steiner, 101 N.M. at 784, 689 P.2d at 933. Nothing in Article IV suggests the existence of a financial obligation like that used to secure a lien upon which a lienholder may foreclose. The Supreme Court of New Mexico has stated: "We have previously held that the intention of a promissor to create a lien must be clearly disclosed in the agreement before an equitable lien arises." First Nat'l Bank in Tucumcari v. Berger Briggs Real Estate & Ins., Inc., 89 N.M. at 186, 548 P.2d at 864. As the Supreme Court of New Mexico has related, the intent to create of a lien may be demonstrated as follows:

> "In the creation of a lien by express contract, the agreement must clearly show an intention to create such lien, the property sought or intended to be charged must be clearly described or identified, and the property must be distinctly appropriated to or dedicated to, or held as security for, the payment of the debt or obligation in question."

First Nat'l Bank in Tucumcari v. Berger Briggs Real Estate & Ins., Inc., 89 N.M. at 187, 548 P.2d at 865 (quoting 51 Am. Jur. 2d Liens § 27).

There is no clear expression of an intent to create a lien, given that the property is not "distinctly appropriated to or dedicated to, or held as security for, the payment of the debt or

obligation in question." <u>First Nat'l Bank in Tucumcari v. Berger Briggs Real Estate & Ins., Inc.,</u>
89 N.M. at 187, 548 P.2d at 865   Once again, it is worth noting that other language in the deed
refers to the existence of covenants in the deed rather than of liens. <u>See</u> Special Warranty Deed at
23 ("The covenants set forth in this Deed shall run with the land hereby conveyed and, to the fullest
extent permitted by law and equity, shall be binding for the benefit and in favor of and enforceable
by Grantor and his successors in office."). Nothing in the Special Warranty Deed suggests that the
HUD has the right to foreclose on the property if the grantee does not pay these funds under Article
IV. In fact, Article IV expressly permits the grantee to seek financing elsewhere from a third-party
mortgagor. <u>See</u> Special Warranty Deed at 26. Furthermore, it is undisputed that the HUD sold the
property to the SNMAHC for ten dollars in consideration rather than entering into a more
complicated financing arrangement. While the HUD may eventually obtain an equitable lien if it
sought to enforce any of its covenants in court -- assuming it can prove its entitlement to that
equitable remedy -- that possibility does not mean that Special Warranty Deed itself creates a lien.
Courts have recognized that a person seeking to enforce a covenant can, in some cases, obtain a lien
against property rather than an injunction seeking compliance with the covenant. <u>See, e.g.,</u>
<u>Oceanside Cmty. Ass'n v. Oceanside Land Co.,</u> 147 Cal. App. 3d at 177-78 ("That the trial court
chose to enforce the covenant through an equitable lien imposed upon the land rather than by a
mandatory injunction directed against Pine Tree was within its discretion.").

The remainder of the relevant provisions in Article IV subordinate any interest the HUD may
acquire during a foreclosure sale to that of the mortgagor. <u>See</u> Special Warranty Deed at 25-26
("Accordingly, and notwithstanding anything contained herein to the contrary, the rights afforded
to the United States Department of Housing and Urban Development as set forth in Section
IV . . . shall be expressly subordinate to the terms of the mortgage granted to secure payment of such

Notes and Bonds . . . .").  Courts have recognized that parties can arrange in a deed to subordinate interests enforceable through a restrictive covenant -- an agreement which the mortgage holder on the property may be able to enforce.  See, e.g., Coral Lakes Cmty. Ass'n, Inc. v. Busey Bank, N.A., 30 So.3d 579, 583-84 (Fla. Dist. Ct. App. 2010)("We conclude that because of the Declaration's plain and unambiguous language subordinating any claim for unpaid HOA assessments to a first mortgagee's claim upon foreclosure or deed in lieu of foreclosure, it controls and absolves the Bank . . . from liability for any assessments accruing before it acquires the parcel.").  One case from the Supreme Court of Minnesota illustrates this principle:

> While such a result may seem harsh, it is nevertheless clear that ground lessors subordinated their rights to those covenants as against Lorraine's mortgagees. The lease drafted by ground lessors' attorney leaves no doubt that "(t)he interest of the Lessors in the leased premises * * * shall be junior and subordinate to the interest of any mortgagee or mortgagees of the Lessee's interest in the leased premises and the building or buildings thereon."

Rep. Nat'l Life Ins. Co. v. Lorraine Realty Corp., 279 N.W.2d 349, 357 (Minn. 1979)(alterations in original).  The HUD and the SNMAHC, in fact, have subordinated Articles VIII and IX, which the Court has found to be restrictive covenants, in their Subordination Agreement.  See Subordination Agreement at 34 ("That in the event such re-financing is consummated, that the restrictions imposed by Articles VIII and IX of the Special Warranty Deed shall be deemed subordinated to the terms of the Indenture by which the Refunding Bonds are issued and the Mortgage securing payment of such Refunding Bonds.").  Courts have recognized that interests third parties may hold can be subordinate to covenants in a granting instrument to property, so it would make sense that parties to a deed -- as well as a bank financing the property -- with a desire to clarify the respective priority of rights in a covenant as they relate to the rights of an outside mortgage would include a provision to that effect.  See, e.g., Bos. Props. v. Pirelli Tire Corp., 134 Cal. App.

3d 985, 992, 185 Cal. Rptr. 56, 60 (Cal. App. 1982)("It need only be said in that regard that " . . . since the subtenant's tenancy is subordinate to the covenants of the master lease, if they are breached by the subtenant the landlord can terminate the master lease . . . ." (emphasis omitted)(alterations in original)); Mendrop v. Harrell, 233 Miss. 679, 693, 103 So.2d 418, 425 (1958)(" In brief, First Federal's deeds of trust, with appellee Conaty as trustee, being later in time to appellants' recorded covenant, and First Federal having constructive notice of it, are subordinate to appellants' lien.").  Furthermore, these provisions take rights away from the HUD regarding enforcement of any breach of this covenant rather than grant any rights to the HUD.

That Article IV provides a formula for computing damages in the event of a breach of a covenant is not abnormal.  Covenants sometimes specify damages for certain types of breaches, presumably to simplify the issue of damages during a court proceeding.  See, e.g., Angel Fire Resort Operations, LLC v. Corda, 138 N.M. at 52, 116 P.2d at 843 (quoting a provision from a covenant that provides: "If any assessment is not paid in full when due, Declarant may charge a late fee of $15 per month and the unpaid portion shall bear interest from the due date at the rate of eight percent per annum . . . .").  Courts interpret language in deeds largely according to "principles of contract law." Agua Fria Save the Open Space Ass'n v. Rowe, 149 N.M. at 814, 255 P.3d at 392 ("Given their 'contractual . . .  nature[,]' however, the construction of restrictive covenants is governed by principles of contract law." (alteration in original)(citation omitted)).  New Mexico courts generally permit parties to include liquidated-damage provisions in their contracts to quantify the amount of potential damages in case of a breach.  See Am. Inst. of Mktg. Sys., Inc. v. Keith, 82 N.M. 699, 702, 487 P.2d 127, 130 (1971)("Subject to certain limitations not applicable here, parties to a contract may fix the sums to be paid as damages in the event of a breach.").

Lastly, these provisions are not easements.  Their language is much more comparable to

restricting the use of the land, like a restrictive covenant, rather than that of an easement -- which often reserve to the grantor a right of physical access to the property or a right of way to the property.  Black's Law Dictionary defines the term easement as "[a]n interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose (such as to cross it for access to a public road)."  Black's Law Dictionary at 585-86.  The Court has carefully compared the language in Articles IV, which governs procedures for sale of the Casa Hermosa property, and provides certain procedures regarding refinancing and foreclosure, to easements in other New Mexico cases, and concludes that no easement was granted.  The party asserting the ownership of an easement has the burden to prove that the granting instrument created an easement.  See Amoco Prod. Co. v. Sims, 97 N.M. at 325, 639 P.2d at 1179 ("The law is jealous of easement claims, and the burden is on the party asserting such a claim to prove it clearly.").  New Mexico courts have found the following language to create an easement: (i) "SUBJECT TO reservation by Grantor of a forty (40) foot road and utility easement along the north and west boundary lines," Camino Sin Pasada Neighborhood Ass'n v. Rockstroh, 119 N.M. at 213-14, 889 P.2d at 248-49 (emphasis in original)(relying on extrinsic evidence to reach this conclusion based on the phrase "subject to" creating an ambiguity); (ii) "GRANTORS EXCEPT AND RESERVE a ten-foot driveway easement across the lands herein conveyed," Germany v. Murdock, 99 N.M. at 680-81, 662 P.2d at 1347-48 (emphasis in original); and (iii) language providing for a "right of ingress and egress" from the land, Martinez v. Martinez, 93 N.M. at 674-65, 604 P.2d at 367-68.

Thus, given that no language in Articles IV, VIII, or IX create a lien, there is no waiver of sovereign of immunity under the facts of this case permitting Wells Fargo to maintain an action against the HUD under 28 U.S.C. § 2410.  The waiver of immunity under 28 U.S.C. § 2410 "applies

only to suits relating to government liens." <u>Stewart v. United States</u>, 242 F.2d at 51.  "Waivers of

sovereign immunity under section 2410(a) must be read narrowly."  <u>Schmidt v. King</u>, 913 F.2d at

839.  Wells Fargo cannot rely upon 28 U.S.C. § 2410 to challenge the provisions in Article IV.[7]

## V.     THE DECLARATORY JUDGMENT ACT DOES NOT PROVIDE AN INDEPENDENT BASIS FOR SUBJECT-MATTER JURISDICTION OR A WAIVER OF SOVEREIGN IMMUNITY.

Wells Fargo argues that the Declaratory Judgment Act provides for jurisdiction and waiver

of sovereign immunity in this case.  The Court has discussed this issue in the past:

> Section 1331 of Title 28 of the United States Code is a general grant of jurisdiction which provides that the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. <u>See</u> 28 U.S.C. § 1331.  Section 2201 of Title 28 addresses the jurisdiction of "any court of the United States" over declaratory actions. 28 U.S.C. § 2201.  Neither of these statutes waives the sovereign immunity of the United States or confers jurisdiction on the district courts over the United States.

<u>La Casa de Buena Salud v. United States</u>, No. 07-238, 2008 WL 2323495, at *6 (D.N.M.

2008)(Browning, J.).  The Tenth Circuit has held that the Declaratory Judgment Act provides no

independent basis for federal subject-matter jurisdiction.  <u>See</u> <u>Henry v. Office of Thrift Supervision</u>,

43 F.3d at 512 ("Whereas the APA confers jurisdiction in some cases, the Declaratory Judgment Act

(DJA) does not itself confer jurisdiction on a federal court where none otherwise exists.").  Thus,

the Declaratory Judgment Act does not provide an independent basis for jurisdiction, nor does it

_____

[7]None of the parties have requested a <u>Mark V</u> hearing or have identified any extrinsic evidence that would call for a <u>Mark V</u> hearing.  According to the Supreme Court of New Mexico in <u>Mark V. Inc. v. Mellekas</u>, 114 N.M. 728, 845 P.3d 1232 (1993), a district court may take extrinsic evidence to determine whether a contract is ambiguous.  See 114 N.M. at 781–82, 845 P.3d at 1235–36.  There are no indications that, at a <u>Mark V</u> hearing, the Court would obtain any extrinsic evidence that would aid in its interpretation of the Special Warranty Deed.  <u>See</u> <u>Abreu v. N.M. Children, Youth and Families Dep't</u>, 797 F.Supp.2d 1199, 1247 n.23 (D.N.M. 2011)(Browning, J.)("Also, the Plaintiffs did not ask for a <u>Mark V</u> hearing or point to any extrinsic evidence it would submit at a Mark V hearing.  There is no indication that, at a <u>Mark V</u> hearing, the Court would have anything different to interpret the implied contract that it has now.").

provide for a waiver of sovereign immunity against the United States.  Consequently, the Court

declines to adopt Wells Fargo's argument.

## VI.     THE HUD DOES NOT OPPOSE PROCEEDINGS TO FORECLOSE ON THE PROPERTY THAT WILL NOT INVALIDATE ANY PORTIONS OF THE SPECIAL WARRANTY DEED OR AFFECT ITS PRIORITY.

The HUD states: "[I]f Plaintiff's alternative position simply is that it seeks the ability to

foreclose on the property, and concedes that its interest in the property is subordinate to HUD's

interest, including Article IV of the Special Warranty Deed, then there is no case or controversy

regarding Plaintiff's alternative pleading and it is not contested." Nov. 15, 2011 Motion at 11.[8]  The

Court has determined that, to the extent Wells Fargo seeks to challenge portions of the Special

Warranty Deed granting interests to the HUD -- such as Article IV -- it has not established the

existence of a waiver of sovereign immunity permitting it to do so in this lawsuit.  Beyond the

---

[8]The Court has already determined that Wells Fargo has not demonstrated that the HUD has waived sovereign immunity for the causes of action Wells Fargo seeks to bring against the HUD. Thus, the Court lacks subject-matter jurisdiction over Wells Fargo's claims against the HUD.  It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."  United States v. Mitchell, 463 U.S. at 212 (citations omitted).  Consequently, it is not necessary to address the HUD's other arguments regarding subject-matter jurisdiction -- specifically that Wells Fargo lacks standing to bring these claims -- given that a court may address jurisdictional arguments in any order, including whether a case or controversy exists:

It is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits.  Thus, as the Court observed in Steel Co.[ v. Citizens for a Better Env't, 523 U.S. 83 (1998)], district courts do not overstep Article III limits when they decline jurisdiction of state-law claims on discretionary grounds without determining whether those claims fall within their pendent jurisdiction, see Moor v. Cnty. of Alameda, 411 U.S. 693, 715-716 . . . (1973), or abstain under Younger v. Harris, 401 U.S. 37 . . . (1971), without deciding whether the parties present a case or controversy, see Ellis v. Dyson, 421 U.S. 426, 433-434 . . . (1975).

Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 585 (1999).

threshold determination necessary to assess subject-matter jurisdiction, the Court has no jurisdiction to address the merits of the parties' dispute over what rights the HUD may have regarding the property, including the effect of any foreclosure sale on the HUD's interest.  If it addressed the merits of the claims Wells Fargo has asserted against the HUD, the Court would be rendering an opinion on the merits absent the subject-matter jurisdiction to do so -- an improper advisory opinion.

Wells Fargo may be able to contest the HUD's rights one day in a different proceeding -- such as a proceeding the HUD brings against Wells Fargo relating to the Casa Hermosa property.  Absent a waiver of sovereign immunity, however, this lawsuit is not a vehicle for Wells Fargo to challenge any provisions in the Special Warranty Deed granting interests to the United States or the priority of any interest the HUD has relating to the property.  It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."  United States v. Mitchell, 463 U.S. at 212 (citations omitted).  As with any jurisdictional issue, the party bringing suit against the United States bears the burden of proving that sovereign immunity has been waived.  See James v. United States, 970 F.2d at 753.  A waiver of sovereign immunity cannot be implied and must be unequivocally expressed.  See United States v. Nordic Vill., Inc., 503 U.S. at 33-34.  The HUD will remain a party to the action while the foreclosure sale occurs.  There is no waiver of sovereign immunity, however, permitting Wells Fargo to seek the relief it prays for against the HUD.

**IT IS ORDERED** that the United States' Motion to Dismiss, or in the Alternative, for Summary Judgment, filed November 15, 2011 (Doc. 24), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Douglas R. Vadnais
Duane E. Brown
Spencer L. Edelman
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Albuquerque, New Mexico

--and–

Joseph L. Werntz
Jessica Ann Janet
Moses, Dunn, Farmer & Tuthill, P.C.
Albuquerque, New Mexico

     *Attorneys for the Plaintiff Wells Fargo Bank, National Association*

Nancy S. Cusack
Hinkle, Hensley, Shanor & Martin, LLP
Santa Fe, New Mexico

     *Attorneys for Defendant Southeastern New Mexico Affordable Housing Corporation*

Kenneth J. Gonzales
  United States Attorney
Manuel Lucero
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for Defendant United States Department of Housing and Urban Development*